**Frances D. RIPLEY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 3432.**

Supreme Court of Alaska.

Feb. 2, 1979.

David B. Loutrel, Croft, Thurlow, Loutrel & Duggan, Anchorage, for appellant.

Monica Jenicek, Mike Keenan, Asst. Dist. Attys., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and BURKE, Justices.

## OPINION

BOOCHEVER, Chief Justice.

This is an appeal from a conviction of manslaughter and from the sentence imposed. Appellant Ripley was tried before a jury and sentenced to three years imprisonment, to be followed by four years proba-

tion. We affirm the conviction and remand to the Superior Court for resentencing.

Issues raised on appeal concern *Miranda* rights, certain information withheld from a grand jury, the trial court's discretion in limiting playback of testimony, and the severity of sentence under the peculiar factual circumstances of this case. Our review requires that we set forth the factual aspects of this case in some detail.

Frances Ripley is a divorcee with custody of three children. She was employed in the dispatch office of the International Union of Operating Engineers, Local 302.

In her capacity as a dispatch secretary at the union hall, Ripley met Robert Lucas. They began to go out together, even though doing so was in violation of union policy. Sometime later, Lucas and Ripley started living together. They continued that arrangement for about one year. Interpersonal difficulties developed and they separated after Lucas had physically abused her.

Lucas harbored bad feelings. He repeatedly threatened to hire a professional killer to assassinate Ripley and her children if she didn't quit her job at the union hall. He said that if she thought he was bluffing, he had the guy next door taken care of that way. According to Ripley, Lucas told her to get out or be killed because "it was over and the union hall wasn't big enough for both of us." Apparently, it was also a matter of injured pride for Lucas, who did not want a woman over him down at the hall. He said that Ripley "was in his way and he eliminated anything in his way."

Ripley, in fear for her life and her three children, changed the locks on her door and started using an alarm system on her car. She instructed her children to come straight home from school, and secured an unlisted phone number.

Three days prior to the shooting, Lucas confronted Ripley at the union hall. He had been placed on the out-of-work list and believed Ripley was responsible. He again threatened Ripley. That evening, Ripley heard a noise under her trailer which sound-

ed like someone crawling around under it. She phoned the police, who visited her trailer and found no evidence of a prowler. Ripley informed the police about Lucas's threats and told them she had a gun. "They said fine, they had a gun too."

Saturday night, Lucas came to Ripley's house. Ripley and Lucas briefly spoke through the locked door while Ripley's oldest son, Duane, phoned the police upon instruction from his mother. Lucas wanted to come in and talk; Ripley told him to talk through the door. Lucas said that all he wanted to tell her was that he had put out a contract on her that day, but if she didn't open the door he'd "blow [her] fucking head off right then." Lucas then turned and walked towards his van. Ripley stated that at this point, she believed that Lucas was going back to his car to get a gun which he often kept there. Ripley unlocked the door, swung it open, and fired two rounds from a single action .44 magnum handgun, killing Lucas in the driveway.

Duane was still on the phone with the police. He gave the phone to his mother, who began to converse with the dispatcher. The dispatcher had heard the shots and was in simultaneous contact with the police en route. The dispatcher was instructed to keep Ripley on the phone. In the course of this conversation, the dispatcher asked Ripley what had happened, and Ripley made unspecified incriminating statements. Just then the police arrived. They entered the house and saw Ripley sitting on the couch crying and talking incoherently. A pistol was on the dining room chair. An officer asked Ripley what had happened, and she continued talking, saying that Lucas had come to the door, that he threatened to put out a contract on her. The officers stopped asking questions. One officer asked a paramedic to treat powder burns on her hand.

While this was being done, she continued to talk, saying that she had gotten the burns from firing a gun, and she had never fired one before. The officer continued to try to calm her. After being treated for the powder burns, Ripley went to the bathroom, where she began putting on makeup. The officer accompanied her, and at that point, he advised her of her rights.

## I

The first issue on appeal is whether the trial court erred in admitting certain unspecified incriminating statements Ripley made to the police dispatcher and later to the officer on the scene. The trial court believed that *Pope v. State*, 478 P.2d 801 (Alaska 1970), was controlling and accordingly denied Ripley's motion to suppress these statements. On appeal, Ripley contends that since the investigation had focused on her as soon as she began her conversation with the dispatcher, she was entitled to a *Miranda*[1] warning at that point, and that all subsequent statements were illegally tainted and should have been suppressed.

■ We do not agree with appellant's contention. This case falls within the "on-the-scene" questioning exception to *Miranda*, which we quoted in *Pope v. State*, 478 P.2d 801, 804 (Alaska 1971):

> General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. 384 U.S. at 477–78, 86 S.Ct. at 1629, 16 L.Ed.2d at 725.

In *Pope*, we suggested several factors to be considered in applying the on-the-scene questioning exceptions:

1. Officer presented with situation of great emergency;

---

1. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court required that prior to custodial interrogation, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. See *Tarnef v. State*, 512 P.2d 923, 933–36 (1973), for an application by this court of the *Miranda* standard, analyzed in *Tarnef v. State: Miranda is Alive and Well in Alaska*, 4 U.C.L.A.–Alaska L.Rev. 92 (1974).

2. A crime of violence had occurred;
3. There was more than one person present at the scene; and
4. To protect the officer's safety and that of others, the officer had to elicit information about what had happened.

478 P.2d at 805. All are present in this case. The officer who first arrived on the scene had to ask what had happened. Other persons, still armed and dangerous, might have been involved. Merely asking what has happened at the scene of a violent crime is not a custodial interrogation.[2]

■ With regard to the dispatcher's conversation with Ripley, it appears that the dispatcher acted quite properly in light of the circumstances. She was instructed to keep Ripley on the phone. She needed to know what had happened in order to aid the officers en route and determine the nature and extent of ongoing danger. Ripley clearly was not in custody while engaged in the telephone conversation with the dispatcher.

## II

Ripley's second point on appeal is that certain exculpatory evidence was not presented to the grand jury, and therefore the indictment was invalid. Specifically, Ripley alleges that the prosecution was aware that a reliable informant had confirmed that Lucas in fact attempted to hire someone to beat her up. Ripley contends that if this information had been presented to the grand jury, it would have substantiated her position concerning Lucas's threats and would have supported her claim of self-defense.

■ This case does not require the court to reach the question of whether and to what extent the prosecutor must present exculpatory evidence to the grand jury since the grand jury was apprised of the substance of the tip.[3] We find no error as to this issue.

## III

■ During its deliberations, the jury requested playback of certain direct testimony of prosecution and defense witnesses. Ripley contends that the trial court either failed to exercise its discretion properly, or failed to recognize that it was within its discretion also to direct the jury to playback cross-examination of the witnesses whose direct testimony was reviewed. Our decision in *Price v. State*, 437 P.2d 330, 334–35 (Alaska 1968), quotes from *State v. Wolf*, 44 N.J. 176, 207 A.2d 670, 675–76 (1965):

> If under our system of trials a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement. It must be assumed also that if they had any similar doubts or disagreements about statements of other witnesses they would seek the same remedy. If they do not ask for further reading there is no right in a party to demand it. The matter must be left in the sensitive discretion of the trial judge.

2. *State v. Chambers*, 84 N.M. 309, 502 P.2d 999, 1002 (1972); *Grist v. State*, 510 P.2d 964, 969 (Okl.Cr.App.1973); *see United States v. Marzett*, 526 F.2d 277 (5th Cir. 1976) (per curiam) (police officer's question, after responding to a call about a disorderly person with a gun, "Where is the gun, John?," not custodial interrogation); *United States v. Miles*, 440 F.2d 1175 (5th Cir. 1971) (on arriving at the suspected site of a still, police were shot at; their question to defendant, "What do you mean—trying to shoot someone?", not custodial interrogation); *cf. People v. Morse*, 70 Cal.2d 711, 76 Cal.Rptr. 391, 395–98, 452 P.2d 607, 611–14 (Cal.1969) (guard's question to inmate, when officer came upon body in inmate's cell, "Joe, did you do this?", not interrogation). *See generally* Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?*, 25 S.Carolina L.Rev. 699, 714–19 (1974).

3. Trooper Galyan testified before the grand jury that immediately after the shooting, Mrs. Ripley advised him that Lucas had threatened her life and stated that he was putting a contract out on her life. Ripley's son also testified that Lucas had put a contract out on his mother and was trying to kill her.

He may inquire if they wish to hear the testimony of any other witness, whether or not a party suggests it. But he should not burden a jury with unnecessary reading they do not indicate a need to hear, and it is not error to decline to read further portions of the evidence simply because a party so demands.

It was within the trial court's discretion whether to also require the playback of cross-examination. In applying the reasoning of *Price*, we find no abuse of the trial court's discretion in this case.

## IV

Ripley contends that her sentence of seven years—three years to serve followed by four years probation—is excessive. She argues that probation without any incarceration would be a more appropriate sentence in light of the tragic circumstances of this case, her satisfactory employment history, her need to continue supporting her three children, and her first offender status.

■ Our role in reviewing sentences imposed by the trial courts is to insure that sentences effectuate the purposes of the Alaska Constitution.[4] In *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970), we elaborated on the goals of sentence review:

[I]t is our duty to examine the proceedings below to review for excessiveness or leniency the sentence imposed by the trial court, in light of the nature of the crime, the defendant's character, and the need for protecting the public. We are also obliged to consider the manner in which the sentence was imposed, including the sufficiency and accuracy of the information upon which it was based.

.    .    .    .    .

When a sentence is appealed, we will make our own examination of the record

and will modify the sentence if we are convinced that the sentencing court was clearly mistaken in imposing the sanction it did. [footnotes omitted]

In implementing these provisions, the court has recognized the following goals of criminal sanctions: (1) rehabilitation of the convicted offender into a non-criminal member of society; (2) isolation of the offender from society to prevent criminal conduct during the period of confinement; (3) deterrence of the other members of the community who might have tendencies toward criminal conduct similar to those of the offender; (4) deterrence of the offender himself after release; (5) community condemnation of the individual offender, or in other words, the affirmation of societal norms for the purpose of maintaining respect for the norms themselves.[5]

■ To make a reasoned sentence decision, the sentencing judge must determine the priority and relationship of these objectives in any particular case.[6] This court recognizes that the trial court retains primary responsibility for sentencing,

[b]ut respect for the discretion of the trial judge will not prevent this court from making our own examination of the record and we will modify the sentence if we are convinced that the sentencing court was clearly mistaken in imposing the sanction it did.[7]

Guided by the foregoing principles, we now turn to the facts of the case at bar.

As previously discussed, Ripley lived in fear that the victim, Lucas, might attempt to kill her and her children. Her fear was based upon his expressed intent to kill her or have her killed. A psychiatric examination of Ripley was conducted, and in his report, the psychiatrist concluded that "Mrs. Ripley felt herself to be in real physical danger" and that her ability to perceive

---

4. Alaska Const. art. I, § 12, provides in part:
   Penal administration shall be based on the principle of reformation and upon the need for protecting the public.

5. *State v. Chaney*, 477 P.2d at 444.

6. *Nicholas v. State*, 477 P.2d 447, 448 (Alaska 1970).

7. *Id.* at 449 (footnote omitted).

such danger was not that divergent from the "normal person."[8]

The record is replete with statements of persons who have known Ripley, attesting to her good character. She appears to be a good friend to many. She is typically described as honest, trustworthy and dependable. Many comments refer to the love and concern she has shown for her family, including praise for her as a responsible, prudent mother. The record indicated that she has struggled hard to provide a proper environment for her children.

Most people stated that they had never seen Ripley drink excessively or use drugs. None stated to the contrary. Ripley has committed no other criminal offense, and nothing in the record indicates prior antisocial behavior of any sort. It is a reasonable assumption that had Lucas not put appellant in fear for her safety and the safety of her children, the tragic events of this case would not have occurred.

Ripley is a valued employee. She was described by her employer as an "excellent employee." Her employer testified that he thought the conviction would not have an effect on her job because "[s]he's very effi-

cient at her work" and because "[i]t wouldn't have an effect on our organization, and our membership think very highly of her." When asked if Ripley would be rehired, her employer said that she would be rehired if she served no jail time, but otherwise he was uncertain.

As already noted, this court has recognized five particular goals of criminal sanctions. A discussion of how these goals apply to the sentence of appellant Ripley follows.

### 1. Rehabilitation of the convicted offender into a non-criminal member of society.

There is nothing in her background to indicate that Ripley has a propensity for criminal conduct. She has no history of alcohol or drug abuse or antisocial behavior of any kind. Every indication is that up until the shooting she had shown respect for the laws and respect for others in a manner exemplary of good citizenship.

A psychiatric report[9] indicates that incarceration of Ripley will not serve a rehabilitative purpose.

---

8. Report of Psychiatric Examination by Joseph D. Bloom, M.D., included in Pre-Plea Probation Officer's Report. The report states, in pertinent part:

   The whole of the story need not be repeated here. Suffice it to say for this report that Mrs. Ripley felt herself to be in real physical danger due to threats made directly to her from Mr. Lucas and from her perception that Mr. Lucas was a dangerous man and had a past history of having been involved in a homicide. There is evidence that she was in great fear over the safety of her minor children and had, over the time that he had returned to Anchorage from Valdez, severely limited the activities of her children. There is the clear history of a snowballing of threats and fear with signs of the development of a severe anxiety/fear state. This state is characterized by the continued perception of physical danger, the physical concomitants of anxiety including motor agitation, emotional liability, frequent crying episodes, poor sleep pattern, poor appetite, etc. There is also some history of emotional overreactiveness like the call to the Anchorage police on November 3, 1976 when the whole family heard "someone crawling under the trailer". The officer making the report at

that time observed the complainant to be "very scared". Examples which demonstrate the presence of the anxiety/fear state in Mrs. Ripley are extremely plentiful.

   In summary, prior to the shooting, and building in intensity up to the time of the shooting Mrs. Ripley was suffering from increasing anxiety/fear based on her perception of the threats made upon her life. Further, in summary, her ability to perceive would not be that divergent from the "normal person", there being no serious distortion in her ability to perceive her environment due to mental disorder.

   . . . . .

   . . . As I have said above Mrs. Ripley's perceptions may have very well been those of the normal person placed in a situation of threat and may be more accurately placed in the area of a fear reaction. This is not a mental disorder. My own understanding of the situation would be along the lines of a fear reaction to a real threat.

9. Prepared by Joseph D. Bloom, M.D. This statement, dated March 21, 1977, was allowed to be filed with the Supreme Court on May 25, 1978, at the time of oral argument.

From a rehabilitation point of view, Mrs. Ripley is in the best position possible at the present time. She has her own place to live, a steady job, many friends, and the responsibility for taking care of her children. Disrupting her life at this point with incarceration would be a severe setback for her.

All indications are that Ripley will henceforth continue to be the good citizen she was prior to the shooting of Lucas, and we conclude that no rehabilitative goal would be served by incarceration.

2. *Isolation of the offender from society to prevent criminal conduct during the period of confinement.*

As indicated above, there is no reason to conclude that Ripley will engage in further criminal conduct. Her only criminal act was the result of an unusual and unfortunate set of circumstances. It appears that society would benefit more from her continued productive participation than it would by her isolation, especially since Ripley is the custodial parent of three children, whose developmental needs can best be met by the continued good care provided by their mother.

3. *Deterrence of the other members of the community who might have tendencies toward criminal conduct similar to those of the offender.*

The offender in this case would seem to have no more tendencies toward criminal conduct than the average citizen. Her criminal act was the result of specific, unusual circumstances, the likes of which, fortunately, very few people will ever be confronted with. The victim caused Ripley to be in a state of severe anxiety and fear. Her perception, at the time of the shooting, was that her life and her children's lives were in imminent danger, according to the psychiatric report, and such a perception was not that divergent from what the "normal person" would perceive under the same circumstances.

Therefore, it seems that incarcerating Ripley will have little effect toward achieving the goal of deterring members of the community from acting similarly under the same exceptional circumstances, since, as the psychiatric report implies, a normal person (with no criminal tendencies) might act as Ripley did under the same specific circumstances of this case.

The court below properly noted the strong public interest in promoting non-violent resolution of interpersonal conflicts, when it stated:

> Many people, married or otherwise, I'm sure have differences that create stress and if we shoot each other I'm afraid it would be a worse place to live than it is now.

While it is certainly a fundamental goal to deter such behavior, we believe this case differs radically from the general situation where a person shoots another because of "differences that create stress." The problem which confronted the appellant was more than a mere personal difference between Lucas and her. Lucas had repeatedly threatened her and her childrens' lives, and he had just expressed a present intent to shoot her. Ripley was not merely under stress but in a state of extreme fear and anxiety.

The danger to appellant was found by the jury not to be imminent enough to constitute legal self-defense, and Ripley's actions under the circumstances cannot be condoned. However, as the factual circumstances come closer to approximating legal self-defense, the objective of deterring other persons with similar tendencies should become less important in formulating the sentence.

4. *Deterrence of the offender himself after release.*

As stated previously, every indication is that Ripley will hereafter continue to be the good, peaceful citizen she was before the shooting. Just as she does not require incarceration for rehabilitation, neither does she require it for deterrence, since nothing in her history indicates that she is directed toward criminal behavior.

5. *Community condemnation of the individual offender, or in other words, the affirmation of societal norms for the purpose of maintaining respect for the norms themselves.*

This goal is the only goal of the five listed that is persuasively applicable to the case at bar. While society cannot tolerate a person who actively terrifies another with death threats, neither can society tolerate the killing of another person out of perceived self-protection, under circumstances less imminently harmful than those constituting legal self-defense. The crime of homicide is one of the most grievous offenses. The question remains as to what degree of punishment is appropriate for purposes of affirming the societal norms at issue in this case, under the particular factual circumstances presented.

■ We conclude that the court below was clearly mistaken in sentencing the appellant to three years of incarceration. The sentence imposed by the superior court—three years in jail and four years on probation—was excessive and unnecessary to achieve the goals of criminal sanctions. We find that one year of incarceration with an additional four years on probation is an appropriate sentence under the specific facts of this case. As discussed previously, every indication is that society will benefit more from Ripley's participation than from her exclusion, especially in light of her three children who depend upon her for the good care that she has apparently provided for them up until now. Under the peculiar circumstances of this case, a one-year sentence of imprisonment will adequately affirm societal norms without depriving three innocent children of the nurture and guidance of their mother for an undue period.[10]

The conviction is AFFIRMED and the case REMANDED to the superior court for the resentencing of Ripley in conformity with this opinion.

10. It is the fact that Ripley actually cares for the children, not simply that she is their mother. A defendant who was the father and sole

custodial parent would receive the same consideration.