STATE of Alaska, Petitioner,

v.

Michael SALIT, Respondent.

No. 4456.

Supreme Court of Alaska.

June 6, 1980.

Stephen E. Branchflower, Charles William Cohen, Asst. Dist. Attys., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for petitioner.

M. Gregory Oczkus, Kay, Christie, Fuld, Saville & Coffey, Anchorage, for respondent.

Before CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BOOCHEVER, Justice.

Michael Salit was indicted for possession of a narcotic drug, cocaine, in violation of AS 17.10.010. The state has petitioned for review of the trial court's order suppressing the results of a search of Salit's garment bag which he gave an airline employee during a pre-flight hijacking screening and a search of a hotel room where he had been staying. The garment bag contained eight or nine ounces of cocaine, a large amount of cash, and narcotics paraphernalia. Items of contraband were found in the hotel room. Because the order involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate and present review of the order may materially advance the ultimate termination of the litigation, we have granted review.[1]

## I. FACTS

Michael Salit presented a handbag and a corduroy garment bag to Barbara Lohr for X-ray examination before boarding a plane departing from Anchorage International Airport. Lohr was an employee of Smith Loomis Corporation, a private security company employed by the airlines to conduct the screening required by federal regulations. She put Salit's bags on the conveyor belt running through a machine which X-rays for the presence of weapons or explosives. The garment bag passed through without incident. The handbag, however, was too dense to be X-rayed. As a result, Mr. Sobers, operator of the X-ray machine, indicated that a hand search was in order.

Mr. Flechsing, who was standing at the end of the conveyor belt and removing the already X-rayed items, asked Salit whether the handbag was his. Salit said it was, and Flechsing requested permission to search the bag, which Salit granted. Flechsing unzipped the bag, and observed numerous small zipped bags. When Flechsing asked permission to open the smaller bags, Salit nodded his head. Flechsing then opened two of the smaller bags. He thought that the items contained in the bags might be related to narcotics,[2] and called Officer

1. Appellate Rule 23(d) authorizes such review.

2. Among the items that he found in the bags were: several small ampules, a hand-rolled cigarette, a small pipe, a lighter, a butane torch with a red cap, a glass tube, a small pipe screen, one razor, several pieces of glass, the tip of a small brush, three butane bottles (one with a torch hooked up to it), a small spoon, a Bayer aspirin container, an eyedropper, a pipe and some small bottles.

Marsh, a law enforcement officer stationed nearby. Marsh looked into the bags and saw a small bottle containing a white powdery substance and narcotics paraphernalia. Marsh placed the handbag on a podium in the screening area and had another officer who had been summoned watch Salit and the bag while he notified the airport security police.

Airport security officer Leger arrived. Looking inside the handbag, he recognized the contents as drug paraphernalia. Leger asked Salit to come with him, and began to escort Salit to the airport first aid room,[3] when Leger noticed the garment bag laying over a chair. Leger was informed by Lohr that the bag belonged to Salit.[4] All the other passengers had boarded, but the plane had not left.

Leger asked Salit if the bag belonged to him, and Salit said no. Leger opened the outside compartment. He testified to two reasons for doing so: (1) to make sure that the bag did not contain explosives or other material hazardous to persons or property in the area; and (2) to find out who owned the bag and possibly return the bag to its proper owner, assuming that person was on the aircraft about to depart. Leger testified that this course of action was in accordance with written department procedures for lost and found items.

Leger opened a zippered side compartment and pulled out a magazine. Inside the magazine was an unsealed Manila envelope. He opened the envelope and found a clear plastic bag containing a white powder. He thought that the white substance was cocaine. The search was discontinued, and Salit was escorted to the first aid room where he was advised of his *Miranda* rights.[5] After entering the first aid station, Leger took out the contents of the handbag. This search revealed a large amount of cash, approximately $108,000.00, and a large amount of paraphernalia.

Officer Carter, an Anchorage police officer, arrived and tested the contents of the plastic bag. The test indicated that the contents were cocaine. Salit was formally placed under arrest. Subsequently, an investigator from the Metropolitan Drug Enforcement Unit arrived and requested Salit's consent to search the garment bag. Salit said yes and signed a written waiver form. The investigator went into the garment bag and found another Manila envelope between two magazines. Inside the envelope, there was another plastic bag containing a white powder which he removed.[6] Salit was taken to jail. By this time, Salit had made incriminating statements.

At the jail, Salit threw a paper bag with the telephone number of the Captain Cook Hotel written on it into a trash can. The jailer retrieved that bag and gave it to Officer Carter. Carter and another officer went to the hotel and informed the manager that Salit, still a registered guest, had been arrested for drug offenses. The manager went to Salit's room to see if in fact Salit had absconded owing a $600 hotel bill. The officer went with him and observed narcotics paraphernalia and a white powdery residue on the furniture and the rug. The room was sealed at Officer Carter's request while he obtained a search warrant. The subsequent search of the room yielded several items of contraband.[7]

The defendant moved to suppress: (1) the contents of the handbag; (2) the contents of the garment bag (the cocaine); (3) ad-

---

3. Marsh frisked Salit when he took him and the handbag over to the podium.

4. It is unclear from the record whether Leger discovered the garment bag inadvertently or whether Lohr brought it to his attention.

5. Salit chose to remain silent at that time.

6. The state does not make any argument about the effect of this consent to a second search. This consent and the search were the result of Salit's arrest; the arrest was the result of the

search of the garment bag. Thus, if the garment bag search was illegal, this consent is invalid as the fruit of an illegal search. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

7. The state did not charge the defendant with any separate offenses from the hotel room search. It wants, however, to use the results of the search as evidence.

missions made to police officers; and (4) the fruits of the hotel room search. The court granted part of the motion and denied part. It suppressed the contents of the garment bag because the search of the garment bag did not fit within any of the warrant exceptions:

> In my judgment, exigent circumstances are inappropriate as the bag was in the possession of the police. There's no possibility of its loss or destruction.
>
> I also feel that the abandonment doctrine does not fit the situation. You normally think of the free and voluntary selection to forego your ownership . . . .

Regarding the hotel room search, the court found that the search resulted from Salit's arrest, and the arrest was illegal since it resulted from the warrantless search of the garment bag.

## II. ISSUES

■ There is no dispute that the search of Salit's handbag did not violate his right to be free from unreasonable searches and seizures.[8] While Salit's possession of the narcotics paraphernalia discovered in the handbag may be of evidentiary value, it was not illegal, per se, and cannot constitute probable cause for his arrest. The incriminating evidence which could justify an arrest was discovered in the garment bag. We must determine whether the search of that bag comes within an exception to the requirement that a search warrant be obtained to validate a search.[9]

8. U.S.Const., Amend. IV; Alaska Const., Art. I, § 14.

9. *Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973).

10. This statute enacted 49 U.S.C. §§ 1356, 1357 and 1516 and amended 49 U.S.C. §§ 1301, 1472 and 1511 (1976). It is discussed in Part III of this opinion.

11. The state also suggests that the initial opening of the handbag, and therefore the discovery of the paraphernalia, was not state action because Lohr and Flechsing are employees of a private corporation. The government does not seriously advance this claim, and it is without merit. Every court that has examined the screening program has examined it as state action. Screening of carry-on luggage is required by law.

> At no time since late 1968 could activities of this kind at the nation's airports have been described accurately as "an independent investigation by the carrier for its own purposes," and thus beyond the reach of the Fourth Amendment.
>
> . . . . .
>
> It makes no difference that the act of opening appellant's briefcase was accomplished by a "private" airline employee rather than a "public" official. The search was part of the overall, nationwide anti-hijacking efforts, and constituted "state action" for purposes of the Fourth Amendment.

*United States v. Davis*, 482 F.2d 893, 897, 904 (9th Cir. 1973) (citation omitted).

Salit does not question the constitutionality of the Air Transportation Security Act of 1974,[10] and both parties seem to agree generally that the warrantless searches authorized by the Act fall within the administrative search exception to the warrant requirement. The state contends that:

1. The search of the garment bag was authorized by the Air Transportation Security Act;

2. Salit impliedly consented to the search;

3. Salit abandoned the garment bag; and

4. Salit may not contest the search of the hotel room since he had abandoned all rights to the contents of the room.[11]

We have concluded that the search of the garment bag was not not necessary to accomplish the purposes of the Act, and that Salit did not consent to the search. We also conclude, however, that the officer was justified in believing the garment bag to be "abandoned" so as to permit its search.

Discovery of the fact that Salit had been lodged at the Captain Cook Hotel arose out of his incarceration. Since the validity of Salit's incarceration depends upon there being probable cause for Salit's arrest, which in turn is based on the validity of the garment bag search, evidence obtained from the hotel search is not tainted if the earlier garment bag search is legal. Under the circumstances, the police had the right to

accompany the hotel manager, with his permission, when the abandoned room was inspected, resulting in information on the basis of which the search warrant was secured. The evidence thus obtained should not have been suppressed.

The focal issue for us to determine is whether the search of the garment bag was valid.

### III. SEARCHES UNDER THE AIR TRANSPORTATION SECURITY ACT

During the late 1960's, hijacking of airplanes increased dramatically.[12] Commencing in 1968, the Federal Aviation Administration developed airport screening systems to prevent hijacking. Congress responded to the problem by enacting the Air Transportation Security Act of 1974.

■ Requiring a search, both of persons and their luggage, as a condition of boarding a plane is an extraordinary response to an extraordinary situation. Though courts disagree over the theoretical justification for these searches and over important details of the screening program, all courts have upheld the essentials of the anti-hijacking program, as required by the Act, and previous federal regulations. The reason is that the fourth amendment permits necessary responses to new dangers, and the special features of hijacking (the grave danger to life, hijackers' lack of concern with witnesses to their crime, the short time of observation of passengers in the boarding area, and the inability of the police to do anything once the plane is in the air) required a unique response.

■ The Act requires screening by "weapon-detecting procedures." 49 U.S.C. 1356(a). The only legitimate purpose of the screening program is to prevent weapons, including explosives, from being brought into boarding areas and onto planes.[13] As the court stated in *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973):

> [S]creening searches of airline passengers are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings.

Depriving passengers of weapons is critical because it is only through possession of a weapon on board a plane in flight that a person can be a hijacker and

> literally turn the plane itself into a weapon, threatening not only those within it, but those on the ground as well. In short, the plane may become a weapon of mass destruction that no ordinary person would have any way of obtaining except through a hijacking.

*United States v. Albarado*, 495 F.2d 799, 805 (2d Cir. 1974).

■ We believe that searches by means of airport screening come under the administrative search exception of the warrant requirement discussed in *Woods & Rohde, Inc. v. State, Department of Labor*, 565 P.2d 138 (Alaska 1977). The United States Supreme Court has applied the rationale in *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970), in upholding a statutory requirement that operators of liquor establish-

---

**12.** Weinstock, *The Airport Search and the Fourth Amendment: Reconciling the Theories and Practices*, 7 U.C.L.A.–Alaska L.Rev. 307 (1978) (hereinafter cited as *Airport Search*), states:

> Between 1961 and 1967 there were only 14 hijackings of American airplanes, an average of two per year. But in 1968 there were 22 hijackings and in 1969 there were a total of 40. As it turns out, this was the high water mark for American airplane hijacking as the numbers dropped off thereafter: 1970–27, 1971–27, 1972–29, 1973–2, 1974–2. Brodsky,

*Terry and the Pirates: Constitutionality of Airport Searches and Seizures*, 62 Ky.L.J. 623, 624 (1974).
*Id.* at 307 n. 1.

**13.** *See United States v. Albarado*, 495 F.2d 799, 804–05 (2d Cir. 1974); *United States v. Davis*, 482 F.2d 893, 913 (9th Cir. 1973); *United States v. Lopez*, 328 F.Supp. 1077, 1082–83 (E.D.N.Y. 1971); *People v. Hyde*, 12 Cal.3d 158, 115 Cal. Rptr. 358, 364, 524 P.2d 830, 836 (1974); S.Rep. No. 93–13, 93d Cong., 1st Sess. at 10 (1973).

ments permit inspections or be subject to a fine.[14] The Court stated:

> We deal here with the liquor industry long subject to close supervision and inspection. As respects that industry, and its various branches including retailers, Congress has broad authority to fashion standards of reasonableness for searches and seizures. Under the existing statutes, Congress selected a standard that does not include forcible entries without a warrant. It resolved the issue, not by authorizing forcible, warrantless entries, but by making it an offense for a licensee to refuse admission to the inspector.[15]

In *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), the Supreme Court upheld inspection of a pawn shop whose owner was licensed to deal in sporting weapons, stating:

> Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible.[16]

The Court concluded:

> We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute.[17]

■ The air travel industry is highly regulated, and though the inspection here is of the property of the passengers rather than of the airplane company itself, the reasons justifying the invasion are the same.

Where the searches are in furtherance of an administrative purpose and not to discover contraband unrelated to that purpose or evidence of unrelated crimes, it is permissible under the fourth amendment [18] and article I, section 14, of Alaska's constitution.

As in other exceptions to the search warrant requirement, however, the screening program must not turn into a vehicle for warrantless searches for evidence of crime. "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904 (1968). Thus,

> it is, and indeed for preservation of a free society must be, *a constitutional requirement that to be reasonable the [hijacking] search must be as limited as possible commensurate with the performance of its functions.*

*United States v. Albarado*, 495 F.2d at 806 (emphasis in original).

■ When the hijacking danger is not present and motivating the police officers, the usual fourth amendment rules apply: a search for evidence of a crime must be supported by probable cause; and, subject to well-delineated exceptions, police officers must obtain a warrant to conduct a search. *See, e. g., Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–1731, 18 L.Ed.2d 930, 935 (1967); *Erickson v. State*, 507 P.2d 508, 514–15 (Alaska 1973).

With these considerations in mind, we shall examine the search of Salit's garment bag.

## IV. WAS THE SEARCH JUSTIFIED AS AN ADMINISTRATIVE SEARCH

■ The purpose of searches under the Air Transportation Security Act of 1974 is to prevent weapons from being brought

---

14. The Court, however, found that the use of force to secure entry was not authorized by the statute.

15. 397 U.S. at 77, 90 S.Ct. at 777, 25 L.Ed.2d at 65.

16. 406 U.S. at 316, 92 S.Ct. at 1596, 32 L.Ed.2d at 92.

17. *Id.* at 317, 92 S.Ct. at 1597, 32 L.Ed.2d at 93.

18. *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973); *People v. Hyde*, 12 Cal.3d 158, 115 Cal.Rptr. 358, 362, 524 P.2d 830, 834 (1974); *Airport Search, supra* note 14 at 324–27.

upon planes for hijacking purposes and to discourage such conduct. The search must be as limited as possible to accomplish that purpose. Here, the garment bag had been subjected to an X-ray search. Unlike the handbag, the contents were observable by this means, and no evidence of weapons or explosives was discovered. Aside from the fact that no one claimed ownership of the bag,[19] nothing justified a more intensive search than in the case of the bags of the other passengers.[20] A search of the contents in an effort to discover drugs was certainly not authorized under this exception to the warrant requirement.

Officer Leger testified that one reason he opened the garment bag was to make sure that it contained no weapons or explosives. The state argues that there could have been weapons or explosives not revealed by the X-ray, hidden perhaps in a fountain pen or other innocuous object. *E. g., United States v. Moreno*, 475 F.2d 44, 49 (5th Cir. 1971), *cert. denied*, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973), which stated:

[M]odern technology has made it possible to miniaturize to such a degree that enough plastic explosives to blow up an airplane can be concealed in a toothpaste tube. A detonator planted in a fountain pen is all that is required to set it off.

The garment bag had been searched once by the X-ray machine; that search revealed no explosives or weapons. Thus, the first question is whether generally the possibility of undetected explosives or weapons is a sufficient government need to justify the further intrusion.

The need to conduct these sorts of intensive searches is not great. Although court decisions and marshals who have found

drugs during airport searches refer to the danger of unconventional weapons and powder explosives, "the hijackers themselves do not seem to be using these weapons and generally restrict themselves to the more conventional tools of destruction." *Airport Search, supra* note 14 at 316. Among the digests of well over 100 American hijackings, none was achieved by futuristic weapons. *Id.* at 316 n. 59. The court in *United States v. Kroll*, 481 F.2d 884 (8th Cir. 1973), rejected the fear of miniature explosives as a basis for opening a business envelope in a briefcase. The circuit court, however, limited its holding by quoting the district court:

[This opinion is based on] the present state of the art of miniaturization. . . [T]hat miniaturization of explosives of sufficient force to constitute a threat to an aircraft could, in the future, be developed to a degree that [might] invalidate the principles expressed [in its opinion]."

*Id.* at 887 n. 4.

The authorized screening procedures, directed toward discovery of conventional weapons, seem to have caused a decrease in hijackings. From a high of forty hijackings in 1969, there were two in 1973 and two in 1974. *Airport Search, supra* note 14 at 307 n. 1. If unconventional weapons do become a problem and require different screening procedures, such as intensive searches of random passengers or passengers who have certain characteristics, that conclusion should be made through authorized procedures, not by individual officers acting in the field. The Air Transportation Security Act and federal regulations expressly provide procedures to respond to new hijacking dangers,[21] and the system can respond deci-

---

19. This fact is dependent on the significance to be placed on Salit's denial of ownership.

20. As found by the trial court, there was no exigency. A different situation would be presented in the face of a specific bomb threat.

21. The Act provides for

research (including behavioral research) and development as [the Federal Aviation Administrator] may deem appropriate to develop, modify, test and evaluate systems, proce-

dures, facilities, and devices to protect persons and property aboard aircraft . . . against . . . aircraft piracy.

49 U.S.C. § 1357(d)(1). The Federal Aviation Administrator must submit semi-annual reports concerning the effectiveness of the program, and he may amend the procedures on thirty days' notice to Congress. If emergency situations call for immediate implementation of the changes, the thirty-day waiting period is not necessary. 49 U.S.C. § 1356(a). Aircraft carriers may also petition the Federal Aviation

sively when there is a need.[22]

▮ Thus, generally, the possibility of explosives or weapons undetectable by X-ray will not justify a warrantless search.[23] Particular circumstances, such as when a bomb threat is received, may justify a search of bags that have successfully passed X-ray. The state argues there were particular facts to suspect explosives in Salit's garment bag: his other bag had a torch, persons who use drugs are dangerous, and Salit denied owning the bag.

▮ The basic requirement is still, however, that the officer must have been looking for instrumentalities of hijacking, not drugs. Officer Leger did not X-ray the garment bag again, and he opened the bag in the middle of the airport, rather than in an isolated, closed room.[24] The trial court did not err in finding that there was no exigency justifying the search.

As to the state's specific facts, the torch was a small butane torch, and Leger apparently correctly identified the contents of the handbag as narcotics paraphernalia, not hijacking tools. The presumption that persons who use drugs are more likely to hijack planes is not supported by any psychological literature on hijackers brought to our attention and is similar to the premise this court has rejected, namely, that people who use narcotics are unreliable witnesses, e. g., *Morrell v. State*, 575 P.2d 1200, 1204 (Alaska 1978).

We conclude that the search was not justified under the general administrative search rationale for inspecting hand-carried bags of airline passengers.

## V. WAS THERE IMPLIED CONSENT TO THE SEARCH?

▮ One of the well delineated exceptions to the warrant requirement is consent searches. *Erickson v. State*, 507 P.2d 508, 515 (Alaska 1973). According to the state, the posted notices [25] and the widespread

Administration to change their airport security plan. 14 C.F.R. 107.5 (1971).

In any event, the procedures followed here did not give the passenger notice that his baggage could be opened and searched. See discussion *infra* at 254, 255.

**22.** Early in the screening program, the FAA had relied on the carriers' voluntary cooperation, but in February, 1972, the FAA required carriers to adopt and put into use within 72 hours an acceptable screening system. Initially, only persons who fit a hijacker profile and activated the magnetometer were further searched. Convinced that some potential hijackers did not meet the profile, the President ordered the screening of all luggage carried on to shuttle flights in July, 1972, and the FAA ordered screening of carry-on luggage for all flights in December, 1972. *United States v. Davis*, 482 F.2d 893, 900–01 (9th Cir. 1973).

**23.** Here we are not stating that the airport personnel may not request permission to open and search a bag that has passed through X-ray. Such a search, however, may not be made without permission of the passenger, in the absence of probable cause to believe that an effort is being made to take weapons or explosives aboard the plane. When there is probable cause to believe that a passenger is seeking to bring weapons or explosives aboard a plane, an exigency is created justifying an immediate search. In the absence of such probable cause the passenger must be afforded the choice of permitting the search or being refused passage aboard the plane. This is specifically what the posted notices concerning baggage inspection provide. For the text of the notices, see note 25 *supra*.

**24.** *United States v. Kroll*, 481 F.2d 884, 887 (8th Cir. 1973) (citation omitted), states:

If [the officer], in fact, seriously believed that weapons or explosives were in the envelope, it is likely that he would have cleared the area of other persons, or have taken the [brief] case and envelope to an area away from the people.

**25.** There were two signs posted at Gate 19 which read:

X–RAY BAGGAGE INSPECTION
* Carry-on luggage is being inspected by X-ray
* Inspections will not affect ordinary undeveloped film
* Remove all X-ray and scientific film from luggage
* Physical inspection may be requested
   Federal Aviation Administration
   U.S. Dept. of Transportation
* It is a crime to carry a concealed weapon aboard aircraft
* Federal safety rules require inspection of persons and hand carried articles passing an inspection point
* Inspection may be refused

knowledge about screening informed airline passengers, including Salit, that their bags might be opened. Therefore, the state argues that Salit consented to the search by handing the garment bag to Lohr. *United States v. Doran*, 482 F.2d 929, 932 (9th Cir. 1973); *United States v. Williams*, 516 F.2d 11, 12 (2d Cir. 1975) (*per curiam*).[26]

We find this analysis slightly askew. Although the notices and foreknowledge of the passengers are relevant to the reasonableness of the search, they do not make this, or any other hijacking search, a consent search.

[C]onsent to a search, in order to be voluntary, must be unequivocal, specific and intelligently given, uncontaminated by any duress and coercion, and is not to be lightly inferred.

*Erickson v. State*, 507 P.2d at 515 (footnote omitted).

It is clear that Salit did not expressly consent to the search of the garment bag in the way that a person who says, "Officer, you may search my home,"

consents to a search. What the state means is that the law should imply Salit's consent to search the garment bag from his prior act of giving the bag to the airlines.[27] But the mere fact that persons are on notice that they may be searched cannot, by itself, be the basis for implying consent:

This [would] mean that any kind of governmental intrusion is permissible if it has occurred often enough. The government could not avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped, or that all homes would be searched.

*United States v. Davis*, 482 F.2d 893, 905 (9th Cir. 1973). *See also United States v. Albarado*, 495 F.2d 799, 807 n.14 (2d Cir. 1974).[28]

Assuming that on the basis of the posted notices Salit gave implied consent to X-ray his bag, it cannot be inferred that he gave implied consent to allow the opening and searching of his bag. Although the

---

* Persons refusing inspection will not be permitted to pass the inspection point

U.S. Govt. Printing Office: 1974 528–756

**26.** The court in *Williams* stated:

[T]here was implied consent to search the carry-on baggage by virtue of the fact baggage which one does not want to have searched may be consigned to the baggage compartment.

*United States v. Williams*, 516 F.2d 11, 12 (2d Cir. 1975). The court also stated there was evidence of express consent. *Id.*

**27.** *Airport Search, supra* note 12, states:

One of the most hotly debated practical problems in the area of airport searches has been whether and until what point a prospective passenger has the right to avoid the screening searches by leaving.

*Id.* at 320 (footnote omitted). *Compare, e. g.*, *United States v. De Angelo*, 584 F.2d 46, 48 (4th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979), *with United States v. Homburg*, 546 F.2d 1350, 1352 (9th Cir. 1976). We are not confronted with this problem in this appeal.

**28.** It may be argued that the consent of airline passengers is not voluntary because it results from the choice: one must be searched without

a warrant and without probable cause or one cannot fly. The court in *United States v. Kroll*, 481 F.2d 884, 886 (8th Cir. 1973), pointed out:

Compelling the defendant to choose between exercising Fourth Amendment rights and his right to travel constitutes coercion; the government cannot be said to have established that the defendant freely and voluntarily consented to the search when to do otherwise would have meant foregoing the constitutional right to travel.

The Second Circuit agreed:

To make one choose between flying to one's destination and exercising one's constitutional right appears to us, as to the Eighth Circuit, *United States v. Kroll*, 481 F.2d 884, 886 (8th Cir. 1973), in many situations a form of coercion, however subtle.

*United States v. Albarado*, 495 F.2d 799, 806–07 (2d Cir. 1974) (citation omitted). The California Supreme Court has also cited the reasoning in *Kroll* with approval. *People v. Hyde*, 12 Cal.3d 158, 115 Cal.Rptr. 358, 360, 524 P.2d 830, 832 n.2 (1974).

The argument, however, is more persuasive as applied to the search of the person of an airline passenger than to his hand carried bag. The passenger has the choice of checking the baggage for shipment rather than hand carrying it. Checked baggage is not subject to the inspection procedures authorized by the Air Transportation Security Act of 1974.

notice provided that carry-on luggage "is being inspected by X-ray," it stated "Physical inspection may be requested," and "Inspection may be refused." The notice thus indicates that before a physical inspection, there would be a request and a right to refuse the request, which would result in the passenger not being permitted "to pass the inspection point." Under these circumstances, we cannot say that the government has borne its burden of proof that Salit knowingly gave implied consent to open and search his bag. *See United States v. Davis*, 482 F.2d 893, 913–15 (9th Cir. 1973).

As we have explained in the preceding section, the further search of the garment bag cannot be justified as an administrative search for the purpose of deterring hijacking by discovering weapons or explosives. Therefore, it exceeded the bounds of any implied consent to such an administrative search. The search cannot be justified as based on implied consent.

## VI. WAS THE GARMENT BAG ABANDONED SO AS TO BE SUBJECT TO SEARCH?

As we have indicated in the presentation of facts, after all the other passengers had boarded the plane but before its departure, Leger began to escort Salit, who had been frisked, to the first aid room. At that time, Leger observed the garment bag and was informed by Lohr that it was the bag Salit had handed her. Leger asked Salit if the bag was his, and Salit said no.

▮▮▮▮▮ One relinquishes the right of privacy to property by abandoning it. As a result, the protections of the fourth amendment do not extend to abandoned property.[29] Additionally, the state argues that a defendant who has abandoned property sometimes lacks standing to raise fourth amendment issues arising out of the search of that property.[30] However, where possessory offenses are involved, as is the case here, we find the state's argument as to

standing untenable. It would be a completely anomalous result to allow the government to argue that the alleged contraband belonged to Salit for purposes of conviction, but that it did not belong to him for purposes of standing. As Justice Frankfurter wrote in *Jones v. United States*, 362 U.S. 257, 263–64, 80 S.Ct. 725, 732, 4 L.Ed.2d 697, 704 (1960):

> Petitioner's conviction flows from his possession of the narcotics at the time of the search. Yet the fruits of that search, upon which the conviction depends, were admitted into evidence on the ground that petitioner did not have possession of the narcotics at that time. The prosecution here thus subjected the defendant to the penalties meted out to one in lawless possession while refusing him the remedies designed for one in that situation. It is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government. The possession on the basis of which petitioner is to be and was convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e).

Furthermore, this is not a case where Salit is asserting the rights of third parties in the property.

The real issue here is not standing, but whether there was such an abandonment as to terminate Salit's reasonable expectations of privacy in the bag. When property is abandoned, it no longer is subject to the protection of the fourth amendment.

Thus, in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), when prohibition agents found a jug and bottle dropped or thrown away by two men who were running away from them, it was held that there was no seizure in the sense of the law, as the items had been abandoned.

Similarly, in *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668, 687 (1960), appropriation of the con-

---

**29.** *Smith v. State*, 510 P.2d 793, 795 (Alaska 1973); 1 W. LaFave, Search & Seizure § 2.6(b) at 366–67 (1978).

**30.** 1 W. LaFave, Search & Seizure § 2.6(b) at 367 (1978).

tents of a wastepaper basket found in a hotel room from which the defendant had checked out was held to be lawful because of abandonment.

Closer to the facts presented to us are those of *Lurie v. Oberhauser*, 431 F.2d 330 (9th Cir. 1970). Police arrested three individuals at the Los Angeles airport and, by use of their claim checks, secured seven pieces of baggage. After being transported to the police station, the three that were arrested identified each item of luggage except one suitcase. They denied knowledge of ownership of the suitcase. The court held:

> The appellants disclaimed any proprietary or possessory interest in the incriminating evidence and by so doing abandoned whatever interest they might have had in the property from possession of the claim check.[31]

In *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1974) (*en banc*), two men carrying briefcases set them on the sidewalk when approached by officers. When the men began to walk away, leaving the briefcases behind, they were stopped again and subsequently arrested for failure to carry Selective Service registration certificates. They were taken to a patrol car and again denied knowing anything about the briefcases. An officer opened the briefcases and found illegal sawed-off shotguns inside. The court held:

> The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. *United States v. Edwards, supra*, 441 F.2d [749] at 753 [5th Cir.]; *cf. Katz*

v. *United States*, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576.

The facts of this case show conclusively that Colbert and Reese abandoned their briefcases before the searches took place. In response to police questions they both disclaimed any interest in the briefcases and began to walk away from them. The police officers in no way compelled these actions. Under these circumstances appellants could entertain no reasonable expectation of privacy in them.[32]

In *United States v. Jackson*, 544 F.2d 407 (9th Cir. 1976), Jackson, suspected of dealing in narcotics, dropped a suitcase when approached by a federal narcotics agent and a policeman. He was arrested after taking about three steps, and was taken to a police car. After being warned of his rights, he agreed to talk, but denied dropping the suitcase, saying that he had never seen it before. The court found that there was abandonment, not in the property-right sense, but by relinquishment of Jackson's interest in the property to such an extent that he no longer retained a reasonable expectation of privacy in it at the time of the search.[33]

*Jackson* presented a question as to whether the arrest was illegal so that the acts taken to establish the abandonment were brought about by unlawful police conduct. If so tainted, the court would not consider the suitcase as abandoned. A majority of the court found that the arrest was legal.

Here, Salit's denial of ownership of the garment bag at a time when the other passengers had departed the area justified Leger in treating the bag as abandoned, unless Salit's denial was attributable to unlawful police conduct. We must therefore determine whether Salit's denial of ownership was so tainted.

---

31. 431 F.2d at 333. The court in *Lurie*, however, based its holding on lack of standing.

32. 474 F.2d at 176–77.

33. Other cases similarly hold that abandonment may arise out of disclaimer of ownership in answer to police questioning. *United States*

v. *Anderson*, 500 F.2d 1311, 1317 (5th Cir. 1974) (*rhg. en banc*); *United States v. Berkowitz*, 429 F.2d 921 at 925 (1st Cir. 1970); *State v. Walker*, 119 Ariz. 121, 579 P.2d 1091 (1978); *State v. Brown*, 45 Ohio App.2d 76, 341 N.E.2d 325 (1975).

Salit had not been given a *Miranda* warning [34] at the time he was asked whether he owned the bag. If the question constituted custodial interrogation, such a warning was required. In determining whether interrogation is custodial, the place of interrogation may be significant.[35] Salit was still in a public area and had not been placed under arrest or told that he could not leave. The signs pertaining to inspection of baggage indicated that inspection could be refused, in which event the person would not be permitted to pass the inspection point. The officer had merely requested Salit to accompany him to the first aid room.

We have adopted an objective reasonable person test, that is, whether a reasonable person would have thought he was in custody, and we have rejected a subjective test based on the thoughts of the police officer or defendant. *Hunter v. State*, 590 P.2d 888, 894–95 (Alaska 1979). Leger was questioned:

Q. But you did say, please come with me.

A. Yes, sir.[36]

Nevertheless, at the time of the question, Salit was surrounded by several officers. Under the totality of the circumstances, a close question is presented as to whether a reasonable person would feel free to leave and break off police questioning.[37] We need not decide that issue because this was not custodial interrogation.

The question addressed to Salit also appears to come within an exception specifically mentioned in the *Miranda* decision:

General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.

*Miranda v. Arizona*, 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966).[38] Additionally, "interrogation" within the meaning of *Miranda* has been defined as "police questioning . . . that is, likely or expected to elicit a confession or other incriminating statements." *Commonwealth v. Sero*, 478 Pa. 440, 387 A.2d 63, 70 (1978).[39] There is no basis for believing that Leger's question was for the purpose of eliciting an incriminating statement. He did not know the contents of the bag, and it was logical to make the inquiry

---

**34.** In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966), the Supreme Court required that, prior to custodial interrogation,

the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

**35.** 4 C. Torcia, Wharton's Criminal Evidence § 717 at 25–30 (13th ed. 1973) (footnotes omitted), states:

With respect to interrogation by law enforcement officers, the *Miranda* warnings must ordinarily be given where the defendant is interrogated in a police station, police vehicle, prison, or his home; but, absent unusual circumstances, the warnings need not be given where the interrogation takes place on the street, at his place of employment or business, or in a hospital.

**36.** The officer did indicate, however, that if Salit sought to leave the airport he would have asked him to stay. Even assuming the officer

had an unexpressed intent not to allow Salit to leave, custody is not determined by what the officer thinks. *Lowe v. United States*, 407 F.2d 1391, 1397 (9th Cir. 1969).

**37.** *See Hunter v. State*, 590 P.2d 888 (Alaska 1979), for a discussion of the test for custodial interrogation. *See also Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*per curiam*).

**38.** We have previously referred to this exception in two cases involving violent crimes: *Ripley v. State*, 590 P.2d 48, 50 (Alaska 1979), and *Pope v. State*, 478 P.2d 801, 804 (Alaska 1970). The exception is not limited to violent crimes. *See* cases cited in 4 C. Torcia, Wharton's Criminal Evidence § 717, at 22 n.42; Annot., 31 A.L.R.3d 565 (1970).

**39.** *See also United States v. Lewis*, 425 F.Supp. 1166, 1176 (D.Conn.1977); *Application of Santos*, 400 F.Supp. 784, 795 (M.D.Pa.1975); *Eben v. State*, 599 P.2d 700, 708 (Alaska 1979); *Soolook v. State*, 447 P.2d 55, 59 (Alaska 1968), *cert. denied*, 396 U.S. 850, 90 S.Ct. 107, 24 L.Ed.2d 99 (1969).

so that Salit could have the bag taken with him to the first aid room. We do not believe that this single inquiry constituted interrogation.

Nor do we believe that Salit was coerced by being given a Hobson's choice when asked as to his ownership of the garment bag. Previously, his handbag had been opened only after he had granted permission to open it pursuant to a request. The additional closed containers within it also were not opened until he consented. Further, as mentioned previously, the posters indicated that inspection could be refused. He thus was not led to believe that if he admitted ownership the bag would automatically be searched.

■ His denial of ownership of the bag, when all other passengers had departed the area, justified Leger in considering it to be abandoned. Under those circumstances, the opening of the bag did not violate Salit's reasonable expectations of privacy.[40]

As we indicated previously, the validity of the hotel room search is dependent on the validity of the arrest. There were ample grounds for the arrest resulting from the search of the garment bag, and, accordingly, the evidence obtained from the hotel room search should not have been suppressed.

The order of the superior court, to the extent that it suppressed the results of the search of the garment bag and the hotel room, is REVERSED.

MATTHEWS, J., joined by BURKE, J., concurs.

RABINOWITZ, C. J., not participating.

MATTHEWS, Justice, with whom BURKE, Justice, joins, concurring.

I concur with the majority opinion on the issue of abandonment. Since that issue is

dispositive of the case, there is no need to discuss the general doctrinal underpinnings of airport searches. However, the majority opinion does so in parts III, IV, and V. I do not join in those portions of the opinion.

As I interpret the majority opinion, airport security personnel conducting checkpoint carry-on luggage searches can initially search only by using an x-ray device. If the x-rays penetrate the item and show nothing which looks like a weapon, the item may not be physically inspected in the absence of "particular circumstances." The majority opinion does not articulate what those circumstances may be, but the person conducting the search must be able to articulate them in court. A physical inspection cannot be justified by the fact that there are weapons which will not show up on an x-ray, because, according to the majority opinion, hijackers have not been using such weapons.

I think that in making that judgment, the court has departed from its area of competence. Since weapons do exist which will not show up on an x-ray,[1] airport security personnel should be able to search for them. Whether every hand carried item is opened and physically inspected, or only a few items are, is of no constitutional significance.

I agree with the majority opinion that airport screening searches are not subject to the requirement that a search be preceded by a warrant. The circumstances which justify an exception to the warrant requirement are (1) unique danger, (2) the fact that the warrant requirement is unworkable in this area, and (3) the fact that the search is in a sense consented to by those wishing to fly.[2] Those circumstances apply

---

40. The facts with reference to the issue of custodial interrogation are not in dispute. Our decision depends on the legal analysis of those facts. We are therefore not bound by the trial court's view and do not apply the clearly erroneous standard. *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 833–34 (Alaska 1974).

1. In *United States v. Dalpiaz*, 494 F.2d 374, 375 (6th Cir. 1974) the defendant had attempted to carry a non-metallic explosive device on board an airplane.

2. Consent by status is a key factor in the United States Supreme Court cases allowing warrantless searches of regulated businesses relied on by the majority opinion. Speaking of those cases, *United States v. Biswell*, 406 U.S. 311, 92

as strongly to physical inspections as to x-ray inspections.

S.Ct. 1593, 32 L.Ed.2d 87 (1972) and *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 25 L.Ed.2d 60 (1970), the Court has stated: "[B]usinessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade

. . . . The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Almeida-Sanchez v. United States*, 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596, 601 (1973).