Marina SCHAFFER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7080.

Court of Appeals of Alaska.

Oct. 1, 1999.

Order Denying Rehearing
Oct. 29, 1999.

Rex Lamont Butler, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER, and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

When Marina Schaffer checked in for a flight at the Fairbanks airport, the Alaska Airlines ticket agent affixed special white tags to her carry-on luggage—a purse and a backpack. The ticket agent did this because Schaffer fit a "profile" published by the Federal Aviation Administration, a set of criteria designed to identify people who might be carrying weapons, explosives, or incendiary devices. Unbeknownst to Schaffer, the white tag was a directive to the people at the X-ray security station, telling them to hand-search Schaffer's purse and backpack.

When Schaffer presented herself at the security station, she put her purse and backpack through the X-ray machine. When the items had gone through, an agent took Schaffer aside and told her that the contents of her carry-on luggage would have to be removed and examined. Schaffer initially agreed to this, but there is conflicting evidence as to whether she withdrew her consent during the ensuing search.

The agent thoroughly searched Schaffer's purse and then began removing all the contents of Schaffer's backpack. Among the contents of the backpack, the agent found a pair of socks with something wrapped inside them. The agent unwrapped the socks and found a small red zippered pouch, described in the testimony as a coin purse. Unzipping this purse, the agent discovered a small baggie containing cocaine. Schaffer ultimately pleaded no contest to possession of cocaine [1], preserving her right to contest the legality of the search of her belongings.

The superior court upheld the legality of this search on two theories. The court first ruled that, because the search was instigated by an airline employee and performed by a private security agent, the search did not involve state action. Rather, it was a "private" search—a search not governed by the search and seizure provisions of the federal and state constitutions. Alternatively, the superior court ruled that Schaffer agreed to

---

**1.** Fourth-degree controlled substance miscon-    duct, AS 11.71.040(a)(3).

have the security agent search her belongings; thus, the search was justified under the "consent" exception to the warrant requirement.

As explained in this opinion, both of the superior court's rationales for upholding this search are at odds with the Alaska Supreme Court's decision in *State v. Salit*.[2] If the search of Schaffer's belongings is supportable, it must be under the "administrative search" exception to the warrant requirement. Because the superior court did not consider this theory or make any findings of fact concerning it, we must remand this case to the superior court.

*The search of Schaffer's belongings was "state action", not a private search, and thus the search is governed by the Fourth Amendment.*

■ When Schaffer litigated her suppression motion, Superior Court Judge *pro tem* Sigurd E. Murphy ruled that the search of Schaffer's purse and backpack was a "private" search conducted by airline employees. Relying on the principle that private searches are not governed by the constitutional limitations on search and seizure[3], Judge Murphy ruled that the search of Schaffer's belongings was legal regardless of whether the Fourth Amendment to the United States Constitution or Article I, Section 14 of the Alaska Constitution would have barred government officers from performing the same search.

■ "[T]he search and seizure clauses of the Alaska and United States Constitutions apply only to governmental action". A private search—"one that is neither instigated nor joined in by the state"—does not violate either constitution.[4] When the issue of state action arises, the underlying question to be litigated is whether, under the particular circumstances, the government so substantially instigated or insinuated itself into the private person's action that the search can no longer be deemed "private".

Even when we view the evidence in the light most favorable to the superior court's ruling[5], we conclude that the search of Schaffer's belongings was state action, not a private search. According to the testimony, the Federal Aviation Authority directed all airline companies to enforce the "white tag" procedures by (1) screening all passengers using the FAA's profile and then (2) hand-searching the carry-on luggage of all passengers who fit the profile. The FAA directive warned the airlines that the FAA would impose an $11,000 fine each time a passenger fitting the profile was not subjected to the mandated search.

Obviously, airline companies share the government's interest in not having airplanes blown up or hijacked. But just as obviously, the government did not trust the airlines to voluntarily apply the FAA's screening profile and then hand-search all of the selected passengers' carry-on luggage. So, to motivate the airlines to comply with the government's wishes, the FAA threatened the airlines with administrative fines—effectively coercing them to do the government's bidding. The ensuing searches (including the search at issue in Schaffer's case) constitute "state action".[6] "Quite clearly, a search is not private

---

**2.** 613 P.2d 245 (Alaska 1980).

**3.** *See Snyder v. State*, 585 P.2d 229, 231 (Alaska 1978) ("[S]earches by airline employees, acting for an independent and legitimate airline purpose and not in conjunction with or at the direction of the police, do not violate constitutional prohibitions against unreasonable search and seizure.").

**4.** *Long v. State*, 772 P.2d 1099, 1101 (Alaska App.1989) (citing *Snyder*, 585 P.2d at 232; *Whittemore v. State*, 617 P.2d 1, 3 (Alaska 1980); *McConnell v. State*, 595 P.2d 147, 151 (Alaska 1979); *State v. Stump*, 547 P.2d 305, 307 (Alaska 1976); *Bell v. State*, 519 P.2d 804, 807 (Alaska 1974)).

**5.** *Cf. State v. Laraby*, 842 P.2d 1275, 1280 (Alaska App.1992); *Long v. State*, 772 P.2d at 1101 (applying this rule when assessing the sufficiency of the evidence to support a trial judge's findings of fact).

**6.** See *United States v. Davis*, 482 F.2d 893, 897 (9th Cir.1973), holding that the search of an airline passenger's carry-on luggage was government action because it was "part of a nationwide anti-hijacking program conceived, directed, and implemented by federal officials in cooperation with air carriers." The court noted that the government had developed the hijacker detection profile and that the FAA had issued a directive that forbade airlines from permitting any person

in nature if it has been ordered ... by a government official." [7]

The Alaska Supreme Court expressly rejected the "private search" rationale in *State v. Salit:*

> The State ... suggests that the initial opening of the [airline passenger's] handbag, and therefore the discovery of the [drug] paraphernalia, was not state action because [the airport security agents] are employees of a private corporation. [This claim] is without merit. Every court that has examined the screening program has [deemed it to be] state action. Screening of carry-on luggage is required by law.

613 P.2d at 249 n. 11. Thus, the search of Schaffer's belongings is governed by the constitutional restrictions on search and seizure.

### The search of Schaffer's carry-on luggage can not be justified as a consent search.

█ Judge Murphy offered an alternative rationale for denying Schaffer's suppression motion: he ruled that, even if the search of Schaffer's belongings constituted state action and would normally require a warrant, the search was nevertheless justified by the "consent" exception to the warrant requirement.

> *The Court:* I'm finding, based on what has been presented here, that [Schaffer] did consent to the search. She went in[to] the [security] area, ... [knowing] that a search might take place before she got on the ... plane.... She may not have realized that it would be [so] intensive or that they would open up everything that was there, but she realized [that] the contents could be searched.
>
> And once she [realized] that the search was going to be a little more detailed ...

than she [anticipated], she had an opportunity to stop it, [but she] didn't take that opportunity[.] ·What I was looking for, quite frankly, ... was [some action akin] to grabbing [the luggage] and starting to walk away, saying "I'm out of here," or "I'm leaving", or "I don't want you to do this," [or] "I don't want to take the flight," or [any] number of other things ... that [w]ould have said, [in effect,] "I withdraw my consent." ... I didn't hear [anything] ... to indicate that she terminated the search that she'd voluntarily allowed. Even though she didn't like what was happening, she didn't stop it.

These comments show that Judge Murphy's ruling was based on four premises: (1) that Schaffer voluntarily consented to at least some level of inspection of her carry-on luggage when she presented herself at the security station; (2) that the security agent then asked Schaffer to consent to a more thorough inspection, beyond the normal X-raying; (3) that Schaffer voluntarily consented to the more intrusive, hand-inspection of her belongings; and (4) that Schaffer never withdrew that consent.

█ A person may voluntarily consent to have government officials conduct a search or seizure that would otherwise be barred by the constitution.[8] But a person's "consent to a [warrantless] search, in order to be voluntary, must be unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion[.]" [9]

█ When the government relies on the "consent" exception to the warrant requirement, two main issues must be litigated: did the defendant indeed consent, and did the defendant do so with the requisite voluntari-

---

7. *LaFave,* § 1.8(a), Vol. 1, p. 222. *See also La-Fave,* § 10.6(a), Vol. 4, p. 620: "[S]earches conducted under the [airport security screening] system ..., even when [performed] by private guards rather than law enforcement officers, are

fitting the profile from boarding an airplane unless their carry-on luggage was searched. This case is discussed in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 1.8(c), Vol. 1, p. 240 n. 90.

subject to the requirements of the Fourth Amendment."

8. *See Katz v. United States,* 389 U.S. 347, 358 n. 22, 88 S.Ct. 507, 515 n. 22, 19 L.Ed.2d 576, 586 n. 22 (1967); *Sleziak v. State,* 454 P.2d 252, 256 (Alaska 1969).

9. *Erickson v. State,* 507 P.2d 508, 515 (Alaska 1973) (footnote omitted) (quoting *Rosenthall v. Henderson,* 389 F.2d 514, 516 (6th Cir.1968)).

ness? Courts assess these issues by examining all of the surrounding circumstances.[10]

In the context of airport security searches, the basic circumstances are well-known to all air travelers. They can be summarized as follows:

Under the current comprehensive [hijacker] screening system [in place at United States airports], as the passenger approaches the boarding area (often an entryway to a concourse where there are many boarding points)[,] he will be required to place all carry-on items on a conveyor belt leading to an X-ray device. If the X-ray detects an object within a suspicious configuration, then the passenger may not proceed without opening the bag or other container for inspection. While the carry-on items are being screened, the passenger is directed to pass through a magnetometer device of the walk-through type. If the magnetometer is activated, the passenger is requested to divest himself of all metal objects and repeat the process. In those few instances in which the machine is activated once again, the passenger may not proceed without clearing up the matter. This may be done by the passenger extracting additional items from his pockets and then passing the magnetometer test, by his submitting to more particularized inspection by a hand-held magnetometer which pinpoints the [suspicious] object, or by his submitting to a frisk.

*LaFave,* § 10.6(a), Vol. 4, p. 620.

Some courts have relied on "consent" as the Fourth Amendment rationale for these systematic searches of all boarding airline passengers.[11] But *LaFave* concludes that "this approach is basically unsound". *LaFave* argues that, if courts adhere to the recognized standards for determining the voluntariness of a person's consent to search, the consent exception could never justify all of the searches that are conducted during the hijacker screening process:

Rather, ... [given] the nature of the established screening process[,] ... the attendant circumstances will usually establish nothing more than acquiescence to apparent lawful authority. [E]ven if [the express] assent [of the passenger] were obtained, the choices with which the passenger is confronted are such that voluntariness will ordinarily be lacking. Many courts have thus concluded that screening inspections were not consensual when the passenger submitted to the search in order to be able to board his flight and reach his destination.

*LaFave,* § 10.6(g), Vol. 4, pp. 644–45 (footnotes omitted).

Because most airline passengers never express their assent (indeed, are never asked to assent) to the searches that occur at airports, some courts have relied on a theory of implicit consent to justify the search of airline passengers and their belongings. Under this theory, the passengers' consent to be searched is inferred from the fact that people freely choose to travel by airplane, and they make this choice knowing that they and their possessions will be subject to screening before they are allowed to board.[12]

It is questionable whether air travel, with its attendant security searches, is truly an optional activity in Alaska. In many towns and villages, air travel is the only realistic way to enter and leave. Even in those towns served by road, a trip by automobile to the Lower 48 is time-consuming, relatively costly, and involves border searches by two different national governments. Thus, one might reasonably doubt whether an Alaska traveler "freely" chooses to submit to airport searches.

Moreover, as *LaFave* points out, the problem with the "consent" theory is that it conceals—and fails to address—the more fundamental question: is the government's

---

10. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Sleziak v. State,* 454 P.2d 252 (Alaska 1969).

11. See *United States v. Miner,* 484 F.2d 1075 (9th Cir.1973); *United States v. Doran,* 482 F.2d 929 (9th Cir.1973); *United States v. Mather,* 465 F.2d 1035 (5th Cir.1972); *Shapiro v. State,* 390 So.2d 344 (Fla.1980) (alternative ground of decision).

12. See the cases noted in *LaFave,* § 10.6(g), Vol. 4, p. 645 n. 106–08.

regulation of airline passengers reasonable under the Fourth Amendment?

, If it were really true that consent m[ight] be [inferred] because an airline passenger knows of the screening process, then it would logically follow that if the government tomorrow decided to subject those traveling by train, bus or car to similar screening, notwithstanding the absence of any need to do so, all travelers would be deemed to have consented to searches of their persons and effects. This conclusion not only offends common sense, but flies in the face of the most fundamental Fourth Amendment principle that the government cannot "avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped or that all homes would be searched."

LaFave, § 10.6(g), Vol. 4, p. 646 (quoting United States v. Davis, 482 F.2d 893, 905 (9th. Cir.1973)).

Because of these concerns, most courts have ruled that the screening of boarding airline passengers is justified, not under the consent exception to the warrant requirement, but rather under the administrative search exception.[13] The Alaska Supreme Court adopted this view of the matter in State v. Salit.[14]

In Salit, the State advanced essentially the same "consent" theory that Judge Murphy relied on in Schaffer's case. The State suggested that airport searches could be justified as consent searches because (1) the public generally knows that airline passengers' bags can be searched, and (2) notices to this effect are posted at virtually every airport.[15] But the supreme court found the State's analysis "slightly askew":

Although the notices and foreknowledge of passengers are relevant to the reasonableness of the search [under the administrative search exception], they do not make this, or any other hijacking search, a consent search. "Consent to a search, in or-

der to be voluntary, must be unequivocal, specific and intelligently given, uncontaminated by any duress and coercion...." It is clear that Salit did not expressly consent to the search of [his] garment bag in the way that person who says, "Officer, you may search my home," consents to a search. [T]he mere fact that persons are on notice that they may be searched cannot, by itself, be the basis for [inferring] consent, [for this would] "mean that any kind of governmental intrusion is permissible if it has occurred often enough."

Salit, 613 P.2d at 254.[16] The supreme court therefore ruled that the search of Salit's garment bag could not be justified as a consent search.

The facts of Schaffer's case are different from the facts in Salit in one respect: security personnel searched Salit's garment bag without asking him[17], while the security agent in Schaffer's case did inform her of the impending search of her belongings. According to the security agent's testimony, she informed Schaffer that, because the purse and the backpack had been "white tagged", she was required to remove and search the contents of the luggage. The security agent asked Schaffer if it was all right to do this, and Schaffer allegedly said yes.

Viewing this testimony in the light most favorable to the State, Schaffer expressly assented to the search of her belongings. But express assent is not sufficient. As explained above, a search is not justified by the "consent" exception to the warrant requirement unless the State proves that the consent was voluntary, unequivocal, intelligently given, and not the product of duress or coercion.

It is conceivable that an air traveler might freely consent to a search above and beyond the security screening searches routinely conducted at United States airports. But as LaFave points out, even when security agents obtain a passenger's express assent to

13. LaFave, § 10.6(c), Vol. 4, pp. 628–635.

14. 613 P.2d at 250–51.

15. Id. at 253–54.

16. Quoting, first, Erickson v. State, 507 P.2d 508, 515 (Alaska 1973), and second, United States v. Davis, 482 F.2d 893, 905 (9th Cir.1973).

17. Salit, 613 P.2d at 248.

a search, this assent ordinarily will not constitute a valid "consent". Rather, "the attendant circumstances will usually establish nothing more than acquiescence to apparent lawful authority."[18] This was true in Schaffer's case.

According to the testimony, Schaffer watched the security agent conduct a thorough search of her purse. The agent examined every item in the purse, removed most of these items, and looked in every area of the purse. When Schaffer asked why the security agent was searching the purse in this manner, the agent replied that this was required.

After the security agent finished searching the purse, the agent next began to search Schaffer's backpack. Schaffer interposed, "You don't have to do this," but the security agent continued the search, explaining that she was required to do this. When the security agent came to the pair of socks with the coin purse wrapped inside them, Schaffer said, "Don't touch that," and "put that one back". The security agent nevertheless unwrapped the socks and removed the coin purse, then unzipped the purse and examined its contents.

Given this record, we conclude that Schaffer's assent to the search of her belongings was "nothing more than acquiescence to apparent lawful authority". It did not constitute the voluntary, uncoerced consent required by our case law and our constitution.

*The search of Schaffer's belongings is potentially justifiable as an administrative search, but this issue can not be decided without further proceedings in the superior court.*

■ As explained above, *Salit* holds that even though airport security searches are not "consent" searches, they can be justified under the "administrative search" exception to the warrant requirement. The State asks us to uphold the search of Schaffer's belongings on this alternative ground. But several questions of fact must be answered before we can determine whether the search of Schaffer's carry-on luggage was a lawful administrative search.

According to *LaFave*, airport security searches can be deemed lawful administrative searches because (1) these searches constitute relatively limited intrusions geared toward finding particular items (weapons, explosives, and incendiary devices) that pose grave danger to airplanes and air travelers; (2) the scrutiny of carry-on luggage is no more intrusive (in both its scope and intensity) than is necessary to achieve the legitimate aims of the screening process (that is, to ensure air travel safety); (3) airline passengers have advance notice that their carry-on luggage will be subjected to these security measures, thus giving passengers the opportunity to place their personal effects in checked luggage; (4) all passengers are subject to the same screening procedures; and (5) passengers are aware that they can avoid the screening process altogether by electing not to board the plane.[19]

From the record before us, it is unclear whether the exhaustive inspection of Schaffer's belongings can be justified as an administrative search under these criteria. The superior court heard conflicting testimony on some of these issues, and little to no testimony on others. It is, of course, the State's burden to justify any warrantless search.[20] On remand, it will be the State's burden to show that the search of Schaffer's belongings was justified under the administrative search rationale embraced by the Alaska Supreme Court in *Salit.*

*Conclusion*

The superior court gave two reasons for denying Schaffer's suppression motion: first, that the search of Schaffer's belongings was not state action; and second, that Schaffer consented to the search. Both of these reasons were rejected by the Alaska Supreme Court in *Salit.* It is possible that the search of Schaffer's belongings was a valid administrative search under *Salit,* but this determi-

---

18. *LaFave,* § 10.6(g), Vol. 4, p. 645.

19. *LaFave,* § 10.6(e), Vol. 4, pp. 638–641.

20. *See D'Antorio v. State,* 837 P.2d 727, 733 (Alaska App.1992).

nation can not be made until various issues of fact are resolved.

Accordingly, the decision of the superior court is VACATED and this case is remanded for further proceedings on Schaffer's suppression motion. Because the parties have stipulated that this motion is dispositive of the charge against Schaffer, if the superior court rules in Schaffer's favor, the court should then dismiss the charge.

We do not retain jurisdiction of this case.

### ORDER

### Petition for Rehearing

The State of Alaska has filed a petition for rehearing, asking us to expand our decision by addressing two questions of constitutional law.

In *Schaffer v. State,* Opinion No. 1648 (Alaska App., October 1, 1999), we held that the search of Schaffer's belongings could not be justified as either a private search or a consent search, and we directed the trial court to assess the propriety of the search under the rubric of "administrative searches". In its brief to this court, the State argued that the conduct of private citizens acting at the behest of a federal agency must be assessed under federal law, not state law. The State points out that we did not specify in our opinion whether we were applying federal search and seizure law or Alaska search and seizure law to Schaffer's case.

When we held that the search of Schaffer's belongings could not be justified either as a private search or as a consent search, it was not necessary for us to decide whether these questions were governed by the federal constitution or the state constitution—because the result was the same under either body of law. By asking us now to decide that the proceedings on remand should be governed by federal constitutional law as opposed to Alaska constitutional law, the State implicitly raises one issue and explicitly raises another.

The first issue implicitly suggested by the State's petition is that the criteria for a lawful administrative search may be different under the two constitutions. That issue has never been litigated, either in the trial court or in this appeal.

The second issue (which has been briefed by the parties on appeal) appears to involve a choice of law. The State asks us to hold that when a search is conducted by private persons (here, airline employees and private security guards) acting at the behest of a federal agency (the Federal Aviation Administration), the legality of the search—and the admissibility of any evidence obtained through that search—should be governed by federal search and seizure law rather than Alaska law. But the search of Schaffer's belongings occurred in Alaska, and the prosecution against her is being pursued in the Alaska courts. Under these circumstances, the true underlying question involves the exclusionary rule: does Alaska Evidence Rule 412 bar the State of Alaska from relying on evidence obtained by agents of the federal government who perform a search in Alaska that would have been illegal if performed by agents of the State?

This question has no ready answer under Alaska law. In *Pooley v. State,* 705 P.2d 1293, 1302–03 (Alaska App. 1985), this court discussed the applicability of Alaska law to a search to be conducted by agents of another government. But because the search in *Pooley* occurred in California, we ultimately concluded that we did not need to decide whether Alaska law should govern searches conducted within Alaska by agents of another sovereign. The State now asks us to decide this issue on rehearing.

Our sibling states are split on this question; there is no clear legal doctrine that governs this issue. Moreover, it is possible that application of the exclusionary rule in Schaffer's case will hinge on issues of fact that have not yet been litigated. The trial judge did not actively investigate this aspect of Schaffer's case (because he concluded that the search of Schaffer's belongings had been a consented-to private search).

Given the posture of this case, we conclude that the issues raised by the State's petition for rehearing are not ripe for review—primarily because the trial court has

yet to consider whether the search of Schaffer's belongings can be justified as an administrative search. If the proceedings against Schaffer are renewed in the trial court, the State can at that time raise its argument concerning the non-applicability of the Alaska Constitution, and this issue can be litigated in the normal manner.

We therefore deny the State's petition for rehearing.