**Mark NASON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8164.**

Court of Appeals of Alaska.

Dec. 3, 2004.

David D. Reineke, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

COATS, Chief Judge.

Mark Nason was convicted of assault in the first degree and misconduct involving weapons in the third degree (felon in possession of a concealed firearm). In his main point on appeal, Nason argues that Superior Court Judge Beverly W. Cutler erred in allowing him to be handcuffed and shackled in front of the jury without conducting a hearing on whether the restraints were necessary. We agree with Nason that Judge Cutler erred. But because the record is inadequate for us to determine the exact nature of the restraints and whether the jury could observe the restraints, we remand for further proceedings on this issue. Nason also contends that Judge Cutler erred in denying his motion to suppress. Nason's motion to suppress was based on his contention that the troopers did not have a valid consent to search his cabin. We affirm

Judge Cutler's decision in part, but remand for further proceedings on this issue as well.

*Facts and proceedings*

On December 12, 1999, the Alaska State Troopers were informed that a woman had been admitted to Sunshine Medical Clinic in Talkeetna with a gunshot wound. Trooper John Cyr went to the clinic and met with the woman, Heather Gillespie, who was on a gurney being treated when he arrived.

When interviewed by Trooper Cyr regarding the circumstances of her injury, Gillespie told him that her wound had resulted from the accidental discharge of a nine-millimeter handgun she had tossed onto a table while cleaning her cabin. Trooper Cyr recorded the interview. According to Trooper Cyr, Gillespie agreed to allow him to go out to the cabin to investigate.

Trooper Cyr drove to Gillespie's cabin, located about five miles from the clinic. He testified that "no one was home," but a "mirror ... was broken ... [and] it looked like a fight [had occurred.]" Trooper Cyr did not find the nine-millimeter handgun, however he did find a .30–06 rifle in a case and a spent nine-millimeter shell casing. He also noticed two bullet holes in the wall of the cabin that penetrated from the inside to the outside.

Before going off his shift, Trooper Cyr returned to the scene with Trooper John Holm. The purpose of this second trip to the cabin was to brief Trooper Holm on the day's events since Holm would be taking over the investigation. While walking through the cabin, the troopers did not discover any new information.

Meanwhile, Gillespie had been transferred from the Sunshine Medical Clinic to Valley Hospital in Palmer. Trooper Matthew Hightower interviewed Gillespie at the hospital. Gillespie repeated her story that the gun accidentally discharged. At one point Trooper Hightower went to his patrol car to get his cameras to photograph Gillespie's wounds.

When Trooper Hightower returned, Gillespie said, "I didn't shoot myself." She claimed that she and a man named Steve got into an argument. Gillespie quickly corrected herself and stated that the man's name was Mark—she claimed not to know his last name. She repeatedly stated that this Mark was not Mark Patterson, an ex-boyfriend, by whom she was pregnant. This other Mark, whom Gillespie had met while hitchhiking, had been living in her cabin with her for approximately two weeks. Gillespie explained that when she told this Mark to leave, an argument had ensued, ending with him shooting her. Gillespie said that the handgun belonged to Mark and she didn't know if he still had it.

When asked, Gillespie indicated that the troopers still had permission to enter and search her house. Even after Trooper Hightower informed Gillespie of her constitutional right to refuse the search, she signed a consent form.

Trooper Holm then returned to Gillespie's cabin, accompanied by Trooper Andrew Greenstreet. As the troopers pulled up to the cabin, Trooper Holm saw a shadow in the window of someone going up the stairs. After checking the perimeter, Trooper Holm loudly announced their presence and asked for anyone inside to come out. Receiving no response, he then opened the door using his knife. Trooper Holm could hear something inside the cabin, so he used his pepper spray in an attempt to get anyone who was inside to come out; no one responded. Trooper Holm entered the cabin and saw a full bottle of beer on the coffee table that had not been there during his previous visit to the cabin.

The troopers then directed more pepper spray towards the attic and again commanded whoever was there to come out. Still receiving no response, the troopers drew their weapons and went up the stairs. In the attic, they discovered Mark Nason holding a cushion over his face. The troopers handcuffed Nason, who identified himself as "Mark Peterson," and conducted a pat-down search. Nason was carrying "numerous pocket knives, ammunition, and ... a Ruger nine-millimeter" handgun.

Mark Nason was indicted for first-degree assault [1] (for shooting Gillespie) and third-

1.  AS 11.41.200(a)(1).

degree misconduct involving weapons[2] (for being a felon in possession of a handgun). Prior to trial, Nason moved to suppress the evidence seized as a result of the search of the cabin, arguing that the troopers did not have a valid consent to search. After an evidentiary hearing, Judge Cutler denied the motion to suppress, finding that the troopers had valid consent to search the cabin. Judge Cutler did, however, grant Nason's motion to sever the two charges for trial.

Nason's wrists and ankles were shackled throughout both trials and Judge Cutler did not conduct a hearing regarding the necessity of the shackling. In fact, she declared that this issue was a decision for law enforcement personnel, not the court. Nason was convicted on both counts after jury trials, and sentenced to a 15–year presumptive term for first-degree assault and a consecutive 3–year term for third-degree weapons misconduct.

*Judge Cutler erred in failing to conduct a hearing before leaving Nason in shackles during his trial*

When the trooper brought Nason into court just before the start of his trial, Nason's attorney objected to Nason being handcuffed in front of the jury. It appears from the record that Nason was handcuffed and was going to be placed in leg shackles. Apparently there was skirting around the counsel tables so that the jury would not see the leg shackles. When Nason's attorney pointed out that Nason would not be able to approach the bench if court and counsel discussed a legal question, Judge Cutler stated that she generally did not have defendants present at those discussions and stated that she would allow frequent recesses to allow the attorney to consult with Nason about these conferences.

The matter next came up during Nason's first trial. Apparently Nason's counsel was concerned whether the jurors had seen Nason's leg irons. Judge Cutler pointed out that the counsel tables were skirted so that the jurors could not see the leg shackles. She stated that it was important that the jury not see Nason in handcuffs or in leg shackles in a way that would be demeaning. She observed that the handcuffs and leg irons were not visible. She also pointed out that the jury was going to know, from the testimony, that Nason was in custody. She therefore concluded that the jury's observation of any shackling would not be prejudicial. But she stated that the court would try to make sure that the shackles were "not deliberately displayed or emphasized."

The shackling issue came up a third time, at the beginning of Nason's second trial (his trial on the charge of felon in possession of a concealable firearm). Nason's attorney objected to the fact that Nason was in leg shackles. The attorney pointed out that Nason wanted to participate in the evidentiary discussions, which would take place at the bench. Judge Cutler stated that it was up to the state troopers, not the court, to decide on the security arrangements for prisoners. She stated that Nason could participate in conferences at the bench, but if he did, the jury would see the shackling.

The United States Supreme Court has held that "shackling [a defendant in the presence of a jury] should be permitted only where justified by an essential state interest specific to each trial."[3] In Alaska, the leading case is *Anthony v. State*,[4] in which the supreme court stated:

> In the courtroom, guards should remain outside the observation of the jury, and should deliver the defendant to the counsel table before the jury's arrival if necessary; manacles, shackles and other physical restraints are, of course, to be avoided. Deviation from these standards is justified only to protect the safety and decorum of the court, to prevent a threatened escape, or to respond to some other manifest necessity. Such measures should be taken only after the defendant has been given an opportunity for a hearing, and the restraints imposed should be the least intru-

---

**2.** AS 11.61.200(a)(1).

**3.** *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986).

**4.** 521 P.2d 486 (Alaska 1974).

sive which will accomplish the desired result.[5]

In *Anthony* and later cases, the supreme court essentially adopted the ABA's *Standards Relating to Trial by Jury* § 4.1 (Approved Draft 1968).[6] Section 4.1 provides in part:

> Defendants and witnesses should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order. If the trial judge orders such restraint, [she] should enter into the record of the case the reasons therefor. Whenever physical restraint of a defendant or a witness occurs in the presence of jurors trying the case, the judge should instruct those jurors that such restraint is not to be considered in assessing the proof and determining guilt.

■ Applying these standards, it is clear that Judge Cutler erred in failing to hold a hearing to decide what level of restraint was necessary to provide court security. We therefore conclude that the trial court erred in allowing Nason to be shackled without holding a hearing and without making it clear on the record the necessity for any restraints. Our next question is whether Nason was prejudiced by the error.

In *Anthony*, the supreme court stated that the reason to limit shackling was primarily to allow the defendant the presumption of innocence:

> A defendant is presumed innocent throughout the trial, and he should be permitted to face the jury with the appearance and dignity of a free and innocent man.[7]

The prior decisions discussing shackling have focused on the danger that a judge's decision to shackle a defendant might implicitly communicate to the jury the notion that a defendant is dangerous and therefore more likely to be guilty. But if the jury does not know of the shackling, the defendant might not be prejudiced.

■ The record before us is too limited for us to determine whether Nason was prejudiced. It appears from the trial record that Nason was handcuffed and in leg shackles throughout the trial. But it also appears that the tables at which Nason and the attorneys sat had skirting which concealed the leg shackles. Judge Cutler also made comments which suggest that the handcuffing might not have been apparent to the jury. We conclude that the record before us is inadequate to determine the nature of Nason's shackling and whether the jury was prevented from observing the shackling. We therefore must remand on this issue.

On remand, the parties must develop the record of how Nason was shackled (both wrists and ankles) before the jury and whether the jurors would have been able to see the shackling.[8] After the trial court reconstructs the record, the court shall make findings, including findings as to whether and under what circumstances the jurors saw the shackles, and whether Nason was prejudiced by this or any other aspect of the shackling. If the court concludes that Nason was prejudiced, the court shall grant Nason a new trial. The trial court shall inform this court of the new trial and we will close this appeal. In the event that the court determines that Nason was not prejudiced, the court shall forward these findings to this court. If the trial court determines Nason was not prejudiced, after the court serves these findings on the parties, the parties shall have 30 days to file a memorandum with this court addressing the trial court's findings.

### Gillespie gave Trooper Cyr consent to search the cabin

■ Nason contends that Heather Gillespie did not give a valid consent for Trooper Cyr to search the cabin. In order for a consent to be valid, the consent must be voluntary and must be given by one who has

---

5.  *Id.* at 496 (footnotes omitted).

6.  *Anthony*, 521 P.2d at 496 n. 34; *Williams v. State*, 629 P.2d 54, 57 (Alaska 1981); *Hines v. State*, 703 P.2d 1175, 1176 (Alaska App.1985).

7.  *Anthony*, 521 P.2d at 495 (footnote omitted).

8.  *See* Appellate Rule 210(b)(8).

the authority to give it.[9] A consent is voluntary when the person consenting gives an unequivocal and specific consent which is untainted by duress or coercion.[10] A court is to determine the voluntariness of the consent by examining the totality of the circumstances.[11] Following an evidentiary hearing at which Trooper Cyr and Gillespie testified, Judge Cutler found that Gillespie's consent was voluntary and that it was "unequivocal, specific, and intelligently given."

The record consists of not only the testimony of Trooper Cyr and Gillespie, but a tape recording which Trooper Cyr made of the interview. Judge Cutler found, and the record reflects, that Gillespie was carefree and laughing when she talked to Trooper Cyr. Judge Cutler concluded that, in context, Gillespie assured the trooper that the house was hers and that it was fine with her if he wanted to look in the house to investigate the shooting. The judge found that Gillespie did not simply acquiesce to the trooper's authority.

■ Whether Gillespie actually consented is a factual question. We therefore reverse the trial court only if we find the factual finding is clearly erroneous.[12] We conclude that, on this record, Judge Cutler could properly find that the trooper asked Gillespie on two occasions if he could go to her cabin and take a look. Gillespie replied, "Okay." Furthermore, Gillespie gave the trooper explicit directions on how to get to the cabin and how to avoid problems with her dogs. Later in the day, when Trooper Hightower interviewed Gillespie, Trooper Hightower asked Gillespie whether the troopers still had permission to enter her house. Gillespie agreed that the troopers still had permission. In context, we conclude that Judge Cutler did not err in finding that Gillespie consented to allow Trooper Cyr to look in the cabin.

■ Nason argues that, even if Gillespie consented to the search, she imposed two conditions on this consent: First, that Troop-er Cyr needed to go by the Goodbys' house (Gillespie's neighbors) before going to the cabin. But Judge Cutler found that Gillespie was just telling the trooper that he might have fewer problems with her dogs if he got help from the Goodbys. Judge Cutler found that, read in context, Gillespie was not imposing a condition on her consent, but rather was trying to help Trooper Cyr enter the cabin without harming himself or her dogs. This finding is supported by the record.

■ Second, Nason asserts that Gillespie told Trooper Cyr that he would have to wait until she got back before searching. But Judge Cutler found that again, in context, Gillespie's statement was not a condition on her consent but was an expression of concern that Trooper Cyr might have problems with her dogs if he tried to enter the cabin. This finding is supported by the record.

We conclude that Judge Cutler did not err in determining that Gillespie consented to allow Trooper Cyr to search cabin.

*Nason's contention that Gillespie's consent did not authorize the troopers to search the cabin when Nason was present*

Nason argues that, since he was present at the cabin when Troopers Holm and Greenstreet arrived, the troopers needed to get his consent before searching the cabin. In his pretrial motion to suppress, Nason argued that he shared the cabin jointly with Gillespie, and that since he was present when the troopers arrived, the troopers needed to get his consent before entering the residence. The State responded that Gillespie's consent was sufficient even though Nason was present. But Nason never argued this issue at the evidentiary hearing on the motion to suppress. Judge Cutler made no ruling on this issue.

The State contends that, under the facts of this case, Gillespie's consent was sufficient to allow the troopers to enter the cabin without

9. *Nix v. State,* 621 P.2d 1347, 1348 (Alaska 1981).

10. *Schaffer v. State,* 988 P.2d 610, 613 (Alaska App.1999).

11. *Id.* at 613–14.

12. *Murray v. State,* 12 P.3d 784, 789 (Alaska App.2000).

Nason's consent. The State also argues that the search by Troopers Holm and Greenstreet was justified by exigent circumstances or that any evidence would have been inevitably discovered. But because Judge Cutler did not rule on these issues, we cannot decide them. Since we are already remanding the case on other grounds, on remand, the parties may address the remaining suppression issues.

*Conclusion*

The case is REMANDED for further proceedings consistent with this decision.