**Darrell Lee PETERSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8818.

Court of Appeals of Alaska.

April 21, 2006.

Krista Maciolek, Assistant Public Advocate, Palmer, and Joshua P. Fink, Public Advocate, Anchorage, for the Appellant.

Kenneth J. Diemer, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Darrell Lee Peterson appeals his convictions for two counts of fourth-degree controlled substance misconduct (possession of cocaine and methamphetamine) and one count of evidence tampering. He contends that the police obtained the evidence against him during an illegal investigative stop.

For the reasons explained here, we conclude that the challenged investigative stop was lawful, and we therefore affirm Peterson's convictions.

### Underlying facts

In the early morning of February 2, 2002, Kenai Police Officer Aaron Turnage was parked in his patrol car, completing some paperwork. There was another car parked in the same parking lot, about 100–150 feet away. Turnage noticed some unusual movement in the front seat of this car: according to Turnage's later testimony, "there was somebody hunched over the passenger's seat", and "there was some flailing ... going on in the car". Turnage also observed some-one "moving back and forth from the driver's seat to the passenger's seat in a very rapid manner."

Because this "just ... didn't look like normal activity", Turnage drove his patrol car closer to this other vehicle. Hoping to approach unnoticed, Turnage did not turn on his headlights or activate his overhead lights. He parked about 20 to 40 feet behind the other vehicle and called in its license plate to his dispatcher, but this computer check revealed no problems with the vehicle or the vehicle's owner.

At this point, Turnage got out of his patrol car and walked up to the other car, approaching on the passenger's side. When he looked through the window, he saw a man and a woman. According to Turnage, the man was "hunched over the passenger's seat", and he "appeared [to be] pressing th[e] female [passenger] into the seat. He was on top of her.... He was forcefully kissing her on the head, neck, [and] face area."

Turnage could not discern how the female passenger was reacting to this sexual activity, and he was concerned that the man was committing a sexual assault. Turnage walked around to the driver's side "to get the [man]'s attention [and get] him off of [the woman]", so that Turnage could "figure out what was happening".

Standing by the driver's window, Turnage turned on his flashlight, knocked on the window, and identified himself as a police officer. Speaking through the window, Turnage told the man that he needed to speak with him. At first, the driver—later identified as Darrell Peterson—refused to roll down the window or open the car door. Instead, Peterson responded by asking, "What the fuck do you want?" and then declaring, "I'm not doing anything wrong."

Turnage explained to Peterson that it appeared that he was forcing himself on the woman. Peterson responded that the woman was his girlfriend, and that their activity was consensual. However, Turnage testified that, during his conversation with Peterson, the woman "just ... sat there", giving no indication as to whether she agreed or disagreed with Peterson's characterization of the

situation. The woman neither confirmed nor denied that she was being assaulted; she simply sat in the vehicle. When Turnage asked the woman for identification, she did not furnish it to the officer.

At some point during this interaction, Turnage noticed that Peterson was holding a folded dollar bill in his hand. The bill was folded into a "bindle"—that is, a small envelope commonly used to carry drugs. Turnage saw that Peterson was "passing [this bindle] back and forth from hand to hand, very quickly", in a nervous manner.

Still speaking to Peterson through the car window, Turnage asked Peterson for identification. When Peterson replied that he did not have any identification, Turnage asked him for his name and birth date. Peterson identified himself as "Mike Vinzant", and he said that his date of birth was July 17, 1984—a birth date that would have made Peterson seventeen years old. Because Peterson appeared to be considerably older than that (his real age was thirty-four), Turnage concluded that Peterson was giving him false information.

At about the same time that Peterson gave the false name and false date of birth, he opened the car door. At that time, Turnage asked Peterson about the folded-up dollar bill in his hand—whereupon Peterson "opened the bindle and shook it". A large quantity of white crystalline powder cascaded from the bindle and settled over the driver's seat and floorboard of Peterson's car. Peterson also let go of the dollar bill itself; it blew away in the wind (although it was eventually recovered).

Peterson got out of the vehicle and began walking away. Turnage laid hands on him, attempting to arrest him. Peterson slipped from Turnage's grasp and then punched Turnage in the face. Peterson also punched a newly arrived backup officer before he was finally restrained and placed in custody.

*Procedural history*

After the white crystalline powder was tested and found to consist of cocaine and methamphetamine, Peterson was charged with three felonies: two counts of fourth-degree controlled substance misconduct, and one count of tampering with evidence. In addition, Peterson was charged with four misdemeanors: two counts of fourth-degree assault, one count of resisting arrest, and one count of providing false identifying information to a police officer.

Peterson asked the superior court to suppress the evidence of the drug offenses and the evidence tampering. In his suppression motion, Peterson contended that Turnage had lacked justification for approaching his car, questioning him, and asking him to open the car door or window. The superior court denied this motion.

After the superior court denied his suppression motion, Peterson pleaded no contest to all of the charges against him. With respect to the three felony charges, Peterson entered *Cooksey* pleas—that is, he pleaded no contest but reserved his right to litigate the suppression issue on appeal.[1] With respect to the four misdemeanor charges, Peterson entered normal pleas of no contest. (Peterson accordingly does not appeal his convictions for these misdemeanors.)

*The validity of Peterson's Cooksey pleas*

This Court has repeatedly emphasized that a *Cooksey* plea of no contest is not valid unless the issue preserved for appeal is dispositive of the case.[2] The State contends that Peterson's *Cooksey* pleas are invalid because the issue that Peterson preserved for appeal—the legality of the investigative stop—is not dispositive of all of the charges against Peterson. The State argues that even if all evidence of the controlled substances was suppressed, only the two fourth-degree controlled substance misconduct convictions would be dismissed. Peterson could still lawfully be prosecuted for evidence tampering and the misdemeanor charges of as-

---

1. *See Cooksey v. State*, 524 P.2d 1251, 1255–57 (Alaska 1974).

2. See, for example, *Tyler v. State*, 24 P.3d 1260, 1261–62 (Alaska App.2001); *Miles v. State*, 825 P.2d 904, 905 (Alaska App.1992).

sault and resisting arrest, and providing false identifying information.

(See *Napageak v. State*, 729 P.2d 893, 894–95 (Alaska App.1986), where this Court upheld a conviction for assaulting a police officer, even though the assault was committed in response to the officer's unlawful entry into the defendant's house. This general topic—prosecution for a crime that is committed in response to an unlawful search or seizure—is discussed in Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 9.4(f), Vol. 3, pp. 380–81.)

■ The State's challenge to Peterson's *Cooksey* plea is based on a misunderstanding of what happened in the superior court—in particular, what happened on September 8, 2003, when Peterson agreed to enter his no contest pleas.

Neither Peterson nor the State designated this hearing for transcription; we were forced to investigate the matter ourselves. Based on what Peterson's attorney said at this hearing, it is clear that Peterson intended to enter unconditional pleas of no contest to the four misdemeanor charges (two counts of assault on the police officers, plus resisting arrest and providing false information). Only Peterson's pleas to the three felonies (two counts of controlled substance misconduct, plus tampering with evidence) were intended to be *Cooksey* pleas.

We have held that it is improper for the State and the defendant to agree to dismiss one or more charges if the purpose for doing so is to make the defendant's appellate issue dispositive of the remaining charges.[3] But Peterson's case does not present this sort of charging manipulation.

Peterson's attorney apparently concluded that even if Peterson prevailed in his suppression argument, the State would still be able to pursue the four misdemeanor charges (two counts of assault, plus resisting arrest and providing false information). Accordingly, Peterson entered unconditional no contest pleas to these charges. He preserved his right to appeal only the two drug charges and the evidence tampering charge. Thus, if Peterson's suppression argument is dispositive of these latter three charges, his *Cooksey* plea is valid.

The State argues that even though Peterson's suppression argument is dispositive of the drug charges, it is not dispositive of the evidence tampering charge. But the State's "argument" of this point consists of a single conclusory sentence, unsupported by any authority.

Moreover, the authors of *Criminal Procedure, supra,* take the position that the exclusionary rule should be construed to bar the government from introducing evidence of a defendant's act of evidence tampering done in response to an illegal search or seizure. The authors point out that "attempts to dispose of incriminating objects are common and predictable consequences of illegal arrests and searches", and they argue that if the government were allowed to introduce evidence of such acts, this would defeat the policy of the exclusionary rule by "encourag[ing] Fourth Amendment violations in future cases".[4]

We need not definitively resolve this question regarding the scope of the exclusionary rule. Instead, it is sufficient for present purposes to point out that (1) there is respectable authority for the proposition that, if Peterson succeeded in his suppression motion, the State would be barred from pursuing the evidence tampering charge, and (2) the State has failed to present any contrary authority.

For these reasons, we accept the *Cooksey* agreement in this case, and we proceed to decide the merits of Peterson's suppression argument.

*The investigative stop in this case was lawful*

■ At the evidentiary hearing in this case, Officer Turnage presented the testimo-

---

**3.** See *Wells v. State*, 945 P.2d 1248, 1249–1250 (Alaska App.1997); *Spinka v. State*, 863 P.2d 251, 252 (Alaska App.1993) (both holding that a *Cooksey* plea is invalid if the parties agreed to dismissal of companion charges for the sole purpose of making the defendant's suppression motion dispositive of the case).

**4.** LaFave et al., *Criminal Procedure* (2nd ed.1999), § 9.4(f), Vol. 3, pp. 380–81.

ny that we described above, and Superior Court Judge Donald D. Hopwood concluded that this testimony was credible. Accordingly, when we assess the legality of Turnage's actions, we judge the evidence in the light most favorable to Judge Hopwood's ruling.[5]

■ Turnage observed activity in a parked car late at night (or, rather, early in the morning) that was seemingly consistent with a sexual assault. To investigate the situation, Turnage approached the car—but without a show of authority. He parked his patrol vehicle some distance away, he approached the car on foot, he tapped on the window and shined his flashlight to get the driver's attention, and he stated that he wanted to speak to the driver.

In *Barrows v. State*, 814 P.2d 1376 (Alaska App.1991), we confronted a similar encounter between a police officer and a citizen, and we held that no seizure had occurred. In *Barrows*, a police officer approached a parked vehicle on foot, questioned the driver briefly, and requested identification. *Id.* at 1377. We concluded that "[a] reasonable person in [this situation] would have felt free to refuse to comply with this request", and we therefore held that the officer's actions did not amount to a seizure for Fourth Amendment purposes. *Id.* at 1379.

We reach the same conclusion here. Officer Turnage's initial approach to Peterson's vehicle, and his initial contact with Peterson, did not amount to a seizure. Indeed, Peterson obviously felt no compulsion to comply with Turnage's request for conversation—because Peterson responded by asking, "What the fuck do you want?"

■ At this point, Turnage explained to Peterson that it appeared that he was forcing himself on the woman. This announcement conceivably altered the constitutional tenor of the interaction: one could argue that a reasonable person in Peterson's position, after hearing this, would no longer have felt free to ignore Turnage's request for information.

However, even if the encounter turned into an investigative stop at this juncture, Turnage's prior observations of the activity in the car justified his conduct in asking Peterson (1) to either roll down the window or open the car door, (2) to provide identification, and (3) to offer some explanation of the situation.

Peterson refused to either roll down the window or open the door. And, although Peterson declared that he was engaged in consensual activity with the woman in the car, the woman herself neither said nor did anything to confirm Peterson's assertion. According to Turnage, the woman "just . . . sat there"—leaving Turnage with unanswered doubts about the situation.

When Turnage asked Peterson for identification, Peterson replied that he had no documentation with him, and then he gave Turnage a birth date that was obviously false. At this point, we believe that Turnage would have been justified in directing Peterson to step out of the car.

As it turned out, however, Peterson emerged from the car without any direct request from Turnage. And, at essentially the same time, Peterson shook out the contents of the bindle—giving Turnage probable cause to make an arrest.

For these reasons, we conclude that Judge Hopwood correctly denied Peterson's suppression motion.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**5.** *Schaffer v. State,* 988 P.2d 610, 612 (Alaska      App.1999).